[S. F. No. 2315.   Department Two.—September 17, 1900.]

## HANNAH WALL et al., Respondents, v. BRIDGET MINES and GIRLS' DIRECTORY ORPHAN ASYLUM, Intervenor, Appellants.

CORPORATION — ORPHAN ASYLUM — EXISTENCE DE FACTO — SUPPORT OF FINDING.—A finding that an orphan asylum is not a *de facto* corporation is sustained by evidence tending to show that there were no meetings of the members or trustees, no election of officers, no by-laws adopted, no certificates of shares or membership issued, no seal adopted or used, no records or minutes kept, and no corporate acts of any character performed, and that the institution was managed after as it had been before the attempt to incorporate.

ID.—BENEVOLENT CORPORATION DE JURE—VERIFICATION OF ARTICLES—AFFIDAVIT—MANDATORY STATUTE.—In order to constitute a benevolent corporation *de jure*, the articles of incorporation must be verified as required by section 290 of the Civil Code; and there can be no verification within the meaning of that section requiring that certain facts to be set forth in the articles "must be verified by the officers conducting the election" otherwise than by affidavit of those officers.  The statute requiring such verification is mandatory, and not directory.

ID.—AUTHORITY OF SECRETARY OF STATE—CERTIFICATE OF INCORPORATION —PREREQUISITES TO VALIDITY—CERTIFICATE OF COUNTY CLERK—COPY OF ARTICLES.—The secretary of state has no authority to issue a certificate of incorporation without first receiving a copy of the articles of incorporation certified by the county clerk, showing that the steps prerequisite to the assumption of corporate powers have been complied with.

ID.—CERTIFICATE NECESSARY TO INCORPORATION—CERTIFICATE TO ISSUANCE OF PREVIOUS CERTIFICATE—FAILURE OF PROOF.—The certificate of incorporation referred to in section 296 of the Civil Code, required to be issued by the secretary of state, is requisite to give the incorporation a *de jure* existence.  A second certificate signed by him, merely reciting that articles of incorporation were filed in his office on a certain date, on which a certificate of incorporation thereof was issued by him, is not admissible proof of the first certificate, and fails to prove a compliance with the law.

ID.—PLEADING—AVERMENT OF INCORPORATION — FORMER ACTION.—The averment of the incorporation of the orphan asylum intervenor made in the complaint in a former action by the same plaintiffs in which the parties defendant and the issues were not

the same, cannot bind or estop the plaintiffs from denying the incorporation of the intervenor in this case.

ID.—AVERMENT OF COMPLAINT AND ANSWER TO INTERVENTION—AMENDMENT OF ANSWER — INCONSISTENCY — DISCRETION—ABANDONMENT OF ISSUE.—Where the complaint of plaintiffs and the answer of plaintiffs to the intervention of the orphan asylum alleged its incorporation, the court had discretion to allow the answer to the intervention to be amended by denying its incorporation, notwithstanding the inconsistency of the averments. Though the complaint ought also to be amended likewise, yet the failure to do it being immaterial to the issue between plaintiffs and defendants, the amendment of the answer to the intervention may be deemed as in effect an abandonment of the issue presented by the complaint.

ID.—COMPROMISE OF PREVIOUS SUIT—SPECIFIC PERFORMANCE—MORTGAGE OF REAL ESTATE—TITLE—BENEFICIAL INTERESTS OF THIRD PARTIES. In an action to enforce the specific performance of a compromise of a previous suit brought by the same plaintiffs against the same and other parties defendant to enforce a trust against one who is defendant in both actions, in favor of an orphan asylum as an alleged corporation—by which compromise it was stipulated that the corporation had no existence, and that all the real estate in controversy belonged to such defendant, as legal owner, and that a specified piece thereof should be mortgaged and specified sums be paid to the plaintiffs—a decree requiring her to mortgage the entire interest in that property is proper. Any beneficial interests asserted by her to be in codefendants in the previous suit, not made parties to the present action, by reason of an alleged trust declared in the articles of incorporation in favor of a society of which such codefendants were members, are not to be considered in enforcing such compromise.

ID.—INVALIDITY OF TRUST—INVALID CORPORATION.—No valid trust can be created in favor of third parties as members of an unincorporated society in a corporation which has no legal existence *de facto* or *de jure;* and third parties cannot have an interest in property as members of an alleged corporation which has no interest in such property.

ID.—INTERESTS IN UNINCORPORATED SOCIETY NOT INVOLVED.—The interests of third persons as members of an unincorporated society which is not made a party to either action, no issue respecting which was presented or drawn in question apart from the illegal corporation, are not involved, and cannot be considered.

ID.—CONSENT TO COMPROMISE BY CODEFENDANTS—STIPULATION SIGNED BY ATTORNEY—SUPPORT OF FINDING.—Evidence that the codefendants in the previous suit not made parties to the present action for a specific performance of the compromise verbally con-

sented and agreed thereto, and that the stipulation for the compromise was signed by their attorney by their authority and consent, is sufficient to support a finding in favor of the authority of the attorney to enter into the stipulation.

ID.—AUTHORITY OF ATTORNEY TO STIPULATE—CONSTRUCTION OF CODE.—Section 283 of the Code of Civil Procedure was not intended either to enlarge or to abridge the authority given to an attorney by the client, but only to prescribe the manner of its exercise; and an authorized stipulation may be enforced, even if not complying with the terms of that section, if it is not forbidden by any other statute or principle of law.

ID.—RIGHTS OF CODEFENDANTS NOT MADE PARTIES—FINDING—REVIEW UPON APPEAL.—Codefendants in the former suit not made parties to the present action cannot be bound by the judgment therein; and the appellants cannot be heard to complain of any finding made by the court against the existence of any interests of such codefendants in the property involved in this action, no proof of which was given on the trial.

ID.—INEFFECTIVE DEED TO ILLEGAL CORPORATION—GRANTEE NOT IN ESSE—WANT OF DELIVERY AND ACCEPTANCE.—A deed made by the defendant to the alleged incorporated orphan asylum, prior to the compromise, for the purpose of defeating it, is ineffective and void for want of a grantee in esse to take under it; and there can be no delivery of such deed to the illegal corporation or any officer thereof, nor any acceptance thereof, express or implied, and no acceptance can be presumed from the beneficial character of the grant.

ID.—MINOR PARTIES TO COMPROMISE—REPRESENTATION BY GUARDIAN AD LITEM—RATIFICATION AFTER MAJORITY.—The fact that some of the parties to the compromise were minors cannot invalidate it, where they had no general guardian, and were represented in the compromise by their guardian ad litem duly appointed, who assisted in negotiating the compromise, and where his acts were solemnly and expressly ratified by them after becoming of age, in open court and by deeds made in pursuance of the compromise, and by participating in efforts to enforce it.

ID.—COMPLAINT IN INTERVENTION—CROSS-COMPLAINT OF PLAINTIFFS—CONSTRUCTION OF CODE.—An intervention is treated in section 387 of the Code of Civil Procedure as a complaint, to which either party to the action may answer or demur as if it were an original complaint, and where it is adverse to the plaintiffs, they become defendants to the intervention, and have the right as such to file a cross-complaint thereto under section 442 of the same code.

ID.—CONSIDERATION OF COMPROMISE AS TO APPELLANT—ADEQUACY AND FAIRNESS—FINDING AS TO PERSONS NOT PARTIES.—Where the consideration for the compromise as to the appellant against whom it was enforced is manifestly adequate, fair, and reasonable, and

the result of the litigation is to leave all of the title to the property involved in the former litigation in such appellant, it cannot be complained upon the appeal that codefendants in the former suit, as to whom the consideration for the compromise is also found to be fair and adequate, are not made parties to the present action, and are not bound by the decree, and do not share in the results of this action.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying a new trial. Wm. R. Daingerfield, Judge.

The facts are stated in the opinion.

W. W. Foote, for Bridget Mines, Appellant.

J. J. Lermen, for Intervenor, Appellant.

Charles F. Hanlon, for Respondents.

CHIPMAN, C.—Action to specifically enforce an agreement to compromise and settle an action pending in the superior court of the city and county of San Francisco. The pleadings are exceedingly voluminous; the findings are many, covering every conceivable phase of a somewhat complex and anomalous case, and were in favor of plaintiff, as was the decree. The case is here on four separate appeals, to wit, an appeal by defendant, and an appeal by the intervenor from the judgment; and separate appeals by the defendant and intervenor from the order denying a motion for new trial. The transcript of the proceedings is the same, *mutatis mutandis*, in all four appeals, and relates in fact to but one case, and is so treated in the briefs and will be so treated in the opinion.

A brief history of the litigation and an outline statement of the facts, with some account of the pleadings, are essential to any adequate comprehension of the points presented for decision. In 1887 Bridget Mines, defendant, opened a house in San Francisco for the care of orphans and called it "Girls' Directory Orphan Asylum"; she had but a few dollars of money. In 1888 Harrietta Lyman, a plaintiff, joined Mines in her enterprise, but had no money; at that time the asylum was on Van Ness avenue. In 1890 they moved the institution to the corner of Buena Vista and Central avenues, where it is now

situated. They wore a distinguishing uniform as sisters, common to similar societies under the patronage of the Roman Catholic Church, but the association was never recognized or authorized by that church, or any other religious body, in any way. There was a book of rules introduced in evidence, from which the following appear in the record: "Rule 14. After religious profession, whatever money or property has been brought in by any sister becomes the property of the community. No sister may own anything of herself, not even the superior, but is only the administrator of the property belonging to the community. . . . . Rule 20. . . . . These rules must be read once a month in the refectory." How far these rules were observed or bound the sisters does not very clearly appear. Lyman testified that when she came to Mines she was not furnished with a copy of the rules and did not for some time know of their existence; that as others came in later a copy was given them, that she herself had a copy, but never made any promises, either when she was received or afterward; that the rules were occasionally, but not frequently, read. In 1889 Bridget Ferry came in, but brought no money. She is not a party to the present action, but was a party defendant to the first action, hereinafter referred to. In 1890 Joseph Newman conveyed to Mines alone, and to her heirs, the real estate on Buena Vista avenue. Prior to January 26, 1894, Hannah Wall, a plaintiff, came in; she brought with her $250. She was subsequently expelled, as we shall see, and this amount of money was restored to her. She testified that she promised to be obedient to the rules of the institution, and was given a book of the rules. Prior to January 26, 1894, Annie McCarthy came in; she brought no money into the institution. She married subsequently (when does not appear), and is not a party to the present action. Meantime, the property on Buena Vista avenue was expanding into quite a commodious establishment, judging from the large number of orphans there accommodated. It is not shown whence the money came to build and maintain it, except in a general way it appeared that the asylum received quite a large sum annually from the state, and the rest came from charitable contributions, and apparently some from bequests. This part of the history is somewhat vague. On Feb-

ruary 1, 1895, Mines, individually, mortgaged the San Francisco property to the Hibernia Bank for $6,000, and with this money a lot in San Leandro, Alameda county, was purchased and was conveyed to Mines and Lyman. Subsequently, Mines again mortgaged the San Francisco property to the Hibernia Bank for $8,000, all of which, except about $1,500, was used in constructing buildings on the Alameda property. These mortgages, Mines testified, were paid off with money received "from the state and from public subscriptions of the charitable people," except a balance still due the bank, which the court found is $5,000. She testified that in 1898 she received over $9,000 from the state, and the evidence shows that the state aid must have amounted to over $70,000. Mines appears to have been the executive head of the institution, and Lyman the bookkeeper, who kept the accounts, collected the state aid, and performed work of that character. What the other sisters did does not appear particularly. In 1895 Alma Schumann (a minor), one of the plaintiffs, came to the asylum, but had no money. She was a plaintiff in the first action. She did not sign the articles of incorporation. Yvonne Griffith, a minor, one of the plaintiffs, came to the asylum in 1893. She testified that she became a sister in 1896; that she had no money and was entirely supported by the home, but made no vows; she promised to "be obedient and work for the poor, but not without compensation." She did not sign the articles of incorporation, but was one of the plaintiffs in the first action. The foregoing named persons are all who seem to have had any connection with the institution as so-called sisters. On January 26, 1894, an attempt was made to incorporate the institution as a benevolent association by Mines, Lyman, Wall, McCarthy, and Ferry. The question raised of corporation or no corporation will be noticed later.

In the early part of 1897 some internal dissensions arose. Mines and Lyman fell out, and Mines, without any cause as I can discover, stripped Schumann, Griffith, and Wall of their religious robes under circumstances of great humiliation to them, excluded them from the asylum, and forbade their return. On April 17, 1897, Lyman, Wall, Schumann, and Griffith filed a complaint against Mines, Ferry, and McCarthy and

the Girls' Directory Orphan Asylum, a corporation, in which
the existence of the corporation was alleged, and in which also
was set out something of the history and purposes of the as-
sociation and the grievances of the plaintiffs.  Plaintiffs there-
in prayed that the property be adjudged to belong to the cor-
poration, and that Mines holds the title in trust; that she be
restrained from selling or mortgaging the property, and to ac-
count for all moneys and property belonging to said corpora-
tion and convey the same to it, and for general relief.  The
answer denied that any of the parties other than Mines, Ferry,
and Lyman were members of the society when the property
was purchased; denied the alleged trust, denied that a corpo-
ration was formed or directors elected; denied that the articles
of incorporation were verified; in short, denied all the steps
alleged to have been taken to create the corporation, and de-
nied that it has any legal existence.  This action was set down
for trial, after some strenuous but ineffectual efforts to com-
promise the suit had been made and had failed.  On the day
set for the trial Mines informed her attorneys, Messrs. Sulli-
van & Sullivan, that she had changed her mind and would set-
tle; the trial was deferred, and all parties met at the office of
Sullivan & Sullivan.  The court found that a compromise
agreement was entered into and authorized to be carried out,
which took the form of a stipulation in the case and an agree-
ment.  The stipulation in effect was, that the Girls' Directory
Orphan Asylum is not, and never was, a corporation, and that
plaintiffs and defendants in that suit were not members there-
of; that plaintiffs therein have no title or interest in any of
the property described in the complaint; that defendants there-
in, McCarthy and Ferry, have no interest in said property; that
defendant therein, Bridget Mines, is the owner in fee in sev-
eralty of the property and "holds the same free and clear of
all trusts or other use, except her own use"; that Griffith and
Schumann are not, and never were, members of the society
as existing prior to the alleged corporation; that the title of
Mines to the real property described in the complaint be
quieted as against all other parties to the action.  Dated No-
vember 3, 1897, and signed Bridget Mines, Harrietta Lyman,
Hannah Wall, Yvonne Griffith, Alma Schumann, Charles F.

Hanlon, attorney for plaintiffs, Sullivan & Sullivan, attorneys for defendants. Contemporaneously with the stipulation an agreement was entered into by Mines on the first part, Lyman, Wall, Griffith, and Schumann on the second part, by which it was agreed that on the next day, November 4, 1897, Mines would pay the second parties $1,000, and thereupon Lyman, who was a cograntee with Mines therein, would convey to them the Alameda county property, and the other second parties would quitclaim to her their interest therein; that all of second parties would convey by quitclaim all their interest in the San Francisco property; that on payment of the $1,000 said deeds would be delivered to Hanlon in escrow, to be by him delivered to Mines (first party) provided she within five days apply for a loan on the Alameda property for $2,500 secured by mortgage on the same, the money when borrowed to be paid to Lyman. Contemporaneously with the delivery aforesaid by Hanlon, Mines was to execute her note to Lyman for $4,500 secured by mortgage on the San Leandro property; if Mines should fail within one month to borrow the $2,500, then she was to make a note and mortgage to Lyman for $7,000 in lieu of the two notes named, and on delivery of said note or notes Hanlon was to deliver the three deeds to Mines and the transaction "shall be conclusively deemed to have settled all controversies and claims between and against them respectively . . . . excepting the notes and mortgages herein provided for." It was further agreed that "upon the payment of the said sum of $1,000 said parties of the second part, and each of them, will discard and thenceforth cease to wear the bonnet, habit, or costume now worn by members of the order of St. Francis now in charge of the Girls' Directory Orphan Asylum of San Francisco." Dated November 3, 1897, and signed Bridget Mines, Harrietta Lyman, Hannah Wall, Yvonne Griffith, Alma Schumann. Hanlon signed an agreement to the escrow. The deeds were executed by the second parties to the contract and placed in Hanlon's hands on November 4th; the second parties, agreeably to Mines' insistence as a condition, did not again return to the asylum, but discarded their robes and sought and obtained employment "in the world," as they termed it, where they now are. Mines made some effort to get the $1,000 which

she thought was to her credit at the Hibernia Bank, but found that it had been applied on her mortgage debt there. She and her attorneys made some effort also to borrow money to make the payments, but failed. Without notice to plaintiffs she executed a deed of the San Francisco property to the corporation bearing date November 8, 1897, and acknowledged and recorded that day, and on November 10, 1897, she executed and acknowledged a deed of the Alameda property to the corporation, which was recorded in Alameda county November 11th. She testified that the next thing she did was to write a letter directed to Lyman, dated November 22, 1897, in which she asks Lyman to return to the asylum, but says nothing about the other sisters. Hanlon testified that Mines said to him that this letter was not written by her, and that it was not her desire at all. On November 22d Mines wrote a letter to Hanlon, in which she speaks of Hanlon's assistant having called upon her to know if she would send her attorney to Hanlon to see him about the case. She wrote: "About this agreement, it was done without my wishes; in fact, I was forced to do it. You know, Mr. Hanlon, I have done nothing but what you wanted me to do in the beginning. I am willing to have all that were sent away return, and I will pay all expenses. If this is satisfactory you can send for me, and we can settle, but if not no other conditions will be acccepted." To this letter Hanlon replied November 24, 1897, as follows: "My clients will not now accede to your terms as contained in your letter of the 22d inst., and want you to live up to your contract. I will make one last attempt to avoid litigation, and you may call upon me at 1 o'clock P. M.," etc. It seems that several demands had been made upon Mines by Lyman to live up to her contract, by Cousins, guardian *ad litem* for Schumann and Griffith, commencing November 11th, and on the 16th Hanlon informed Mines that unless she carried out her contract at once an action would be brought against her. Nothing seems to have been done except to renew the demands upon Mines at various times, and finally, December 20th, Cousins called upon her and made tender of all the deeds and documents that had been executed under the agreement; also drafts of the note and mortgage which she had agreed to execute; a copy of a formal demand for performance

on her part, and a tender of performance on the part of the other parties which had been previously formally made to her. These papers and documents were all explained or read to her by Mr. Cousins, but she refused to accept any of them and refused to carry out the contract; declared she would pay no money at all, and wound up the interview by saying: "You can proceed against me and have papers served on me, and a lawyer will turn up to fight the case." At a previous interview with her, November 28, 1897, when witness and Hanlon called upon her, witness testified that Mines said she would not have Griffith back, but she wanted Lyman. In several of these interviews she said she did not sign the agreement of her own will; she spoke of having deeded the property, but "she said nothing about rescinding any agreement; she did not use that word." Hanlon testified that at the interview, November 28, 1897, Mines' attention was called to her letter in which she had stated that the girls might return, and, when asked what she meant, replied that she had been advised to write the letter and that she would not allow any of the girls to come back except Lyman; she also said that Sullivan & Sullivan were no longer her attorneys, and denied having any lawyer. In the course of the conversation she said: "I would not have Griffith back for the whole institution. I would sooner break it up than have Griffith back, and I don't want Schumann or Miss Wall, but I will allow Miss Lyman to come back, and we will run the whole thing ourselves." She said that the children were crying for Miss Lyman; "she was the only one who could write up the books or write up the papers for state aid, but she would not have the others back." All attempts to induce Mines to perform the agreements entered into by her having failed, this action was brought. The complaint was filed December 31, 1897, and was verified. On October 26, 1898, two days after the trial began, plaintiffs filed a second amended and supplemental complaint. On August 26, 1898, the corporation, by its attorney R. M. Royce, filed a verified complaint in intervention, to which plaintiffs on the same day filed a second amended and supplemental answer and also a cross-complaint to the same, and, among other things, alleged that the corporation was duly incorporated. On November 4, 1898, while the

trial was in progress, plaintiffs filed an amendment to the amended supplemental answer to the intervention, and by this amendment alleged that the Girls' Directory Orphan Asylum never had been and is not a *de facto* corporation, and had never done business as such corporation or performed corporate acts; and also that it is not, and never had been, a *de jure* corporation, and set forth the particulars in which its articles of incorporation were lacking to constitute it a *de jure* corporation. In addition to defendant's answer to the complaint, she filed October 31, 1898, during the trial, a cross-complaint for rescission of the agreements entered into by her heretofore noticed, to which plaintiffs answered November 1, 1898.

1. Appellants contend that the court erred in finding that the Girls' Directory Orphan Asylum was not a corporation. The finding that it was not a *de facto* corporation was abundantly supported, and appellants do not seriously dispute this conclusion. The evidence tended to show that there were no meetings of the members or trustees, no election of officers, no by-laws adopted, no certificates of shares or membership issued, no seal adopted or used, no records or minutes kept— in short, no corporate acts of any character performed; the institution was managed after as it had been before the attempt to incorporate. There was, therefore, no corporation *de facto*.

2. Conceding the nonexistence *de facto,* appellants claim a *de jure* corporation; and it is contended that if a *de jure* corporation existed it could not be attacked collaterally and could only be questioned by the state. Before any question arises as to the right to attack a *de jure* corporation collaterally there must be proof by the party claiming corporation that it has a *de jure* existence if the fact is denied. How far the right to exist may be attacked collaterally need not be determined in this case, for the reason that the court found, on what we think was sufficient evidence, that intervenor failed to prove the existence of any such corporation. There was no evidence that the facts set forth in the articles were verified as required by section 290 of the Civil Code, or were verified at all. Appellants claim that the requirement of verification is merely directory and not essentially prerequisite to corporate existence, citing *Mokelumne Hill etc. Co. v.*

*Woodbury,* 14 Cal. 425[1]; *Oroville etc. R. R. Co. v. Plumas Co.;* 37 Cal. 354; *Martin v. Deetz,* 102 Cal. 56[2]; *Humphreys etc. v. Mooney,* 5 Colo. 282.

Section 296 of the Civil Code requires a certified copy of the articles which are filed in the office of the county clerk, certified by the clerk, to be filed with the secretary of state, and "the secretary of state must issue to the corporation, over the great seal of the state, a certificate that a copy of the articles, containing the required statement of facts, has been filed in his office; and thereupon the persons signing the articles and their associates and successors shall be a body politic and corporate," etc.

The corporation has no *de jure* existence under the code provisions until the secretary of state has issued the certificate referred to in the above-mentioned section. The word "thereupon" in the code section has the effect to make the issuance of a certificate by the secretary of state a necessary prerequisite to corporate life. (*First Baptist Soc. v. Rapalee,* 16 Wend. 605.) It was proved that the required certified copy of the articles was filed in the office of the secretary of state on January 29, 1894, and the intervenor offered in evidence a certificate of the secretary of state reciting that the articles of incorporation were filed in his office on the above date (which fact properly appeared elsewhere), and also stating "that a certificate of incorporation thereof was issued on said date." Plaintiffs objected that the fact of the issuance could not be proved in this manner, and the court sustained the objection and excluded the certificate. There was some evidence tending to show that some sort of a paper or document was received at the asylum by Wells-Fargo's, and that it had a seal on it, and was a paper like in size to a sample certificate from the secretary of state shown the witness, but as to what was written or printed on the paper or that a certificate did in fact issue there was no evidence. We think the ruling of the court was clearly right. If the intervenor had produced a certified copy of the records of the office of the secretary of state, it would have been admissible under the sec-

---

[1] 73 Am. Dec. 658.　　　　　[2] 41 Am. St. Rep. 151.

tions of the code cited by appellants (Code Civ. Proc., secs. 1826, 1918); but clearly his certificate that he issued a certificate was not admissible. (*Doyle v Mizner*, 42 Mich. 332; *Boyce v. Trustees M. E. Church*, 46 Md. 359.) Nor do we think the presumption "that actual duty has been regularly performed" (Code Civ. Proc., sec. 1963, subd. 15) can dispense with the proof that a certificate was issued, and of its contents. But if it be conceded that there is evidence tending to show that a certificate did issue, there can be no valid certificate where the previous steps made necessary to its issue have not been taken. The secretary of state would have no authority to issue a certificate without a copy of the articles of incorporation should come to him duly certified by the county clerk, nor even then if any of the requirements of the code were omitted which are made prerequisite to the assumption of corporate powers. It was said in *Mokelumne Hill etc. Co. v. Woodbury,* *supra,* in respect of such requirements, that "any material omission will be fatal to the existence of the corporation, and may be taken advantage of collaterally in any form in which the fact of incorporation can properly be called in question." But as to requirements which are not made prerequisites, it was there said: "The corporation is responsible only to the government, and in a direct proceeding to forfeit its charter." We have, then, the question whether the verification required by section 594 is a prerequisite or may be omitted altogether as merely directory. The legislature must have meant what it said when it required certain further facts to be set forth in the articles of incorporation, and that such "facts must be verified by the officers conducting the election." Section 292 of the Civil Code provides that the articles of incorporation referred to in section 290 "must be subscribed by five or more persons, . . . . and acknowledged by each before some officer," etc. This section refers to all private corporations formed under the provisions of the code, but in the case of benevolent corporations still further authentication is required. The legislature has not only required in this class of corporations an acknowledgment before some officer "by five or more persons" (Civ. Code, sec. 292), but the additional facts above referred to, which must appear in the articles, and "must be verified

by the officers conducting the election"; and this means verification as elsewhere referred to in the codes—i. e., by affidavit of these officers. We think this verification is as essential as the acknowledgment, which latter was held to be a prerequisite in *People v. Golden Gate Lodge,* 128 Cal. 257.

Appellant contends that the verification adds nothing to the truth of a statement, but "simply adds dignity to it and places it upon a higher plane." The requirement of verification in pleadings is not so regarded, but must be complied with to give validity to acts pursuant to such proceedings; and we think the reason for so holding applies in the formation of corporations claiming *de jure* existence. (See *In re Close,* 106 Cal. 574, as to insolvency proceedings; *Estate of Boland,* 55 Cal. 310, and *Richardson v. Butler,* 82 Cal. 174,[3] in probate proceedings; and *Ex parte Walpole,* 84 Cal. 584, holding that a petition for *habeas corpus* must be verified.) The notary's certificate is that the persons whose names are subscribed to the instrument are personally known to him, and that they appeared before him and acknowledged that they executed the same. But the law demands something more and something quite different in requiring that the facts thus acknowledged shall be verified by the officers conducting the election. We think this verification a prerequisite to the assumption of corporate powers as a *de jure* corporation.

It is not necessary to decide whether or not the court erred in allowing plaintiffs to prove that one of the subscribers to the instrument did not in fact appear before the notary or acknowledge that she subscribed the articles. Conceding error, it was harmless, since the intervenor failed to prove a corporation in the essential particular above noticed.

3. It is claimed by appellants that the pleadings admit due incorporation, and that it was error to find on the evidence against the admissions of the pleadings. In the first action plaintiffs therein alleged the existence of the corporation and the defendant denied the corporation, and the parties were not the same as in this action. In the present action plaintiffs in their amended and supplemental complaint again alleged the existence of the corporation, and in their answer to the inter-

---

[3] 16 Am. St. Rep. 101.

vention they also alleged the corporation. But before the intervenor and the defendant had closed their evidence plaintiffs obtained leave of the court to amend their second amended and supplemental answer to the intervention, alleging that the Girls' Directory Orphan Asylum is not, and never has been, a corporation *de facto* or *de jure*. Plaintiffs in this action were not estopped by allegations made in the first action of *Lyman v. Mines*, because the parties were different and the issues were different from those presented in this action. In answering the intervention plaintiffs had the right to interpose inconsistent defenses (*Banta v. Siller*, 121 Cal. 414); and although this changed the issues between plaintiffs and intervenor, and put plaintiffs in the position of alleging the corporation in their complaint and denying the corporation in the answer to the intervention, the cause proceeded and the evidence went in under the amended pleadings, by direction of the court that plaintiffs' amended answer to the intervention should be deemed denied both by the intervenor and defendant. Plaintiffs should have also amended their complaint in this particular, but as the issue of corporation or no corporation was really immaterial as between plaintiffs and defendant, the failure to amend the complaint could not have injured anyone; and, besides, the answer to the intervention denying the corporation may be regarded under the circumstances as in effect an abandonment of the issue presented by the complaint; the issue did not in fact become material until presented by the intervenor. Whether the amendment should have been allowed was a question addressed to the discretion of the court.

4. It is complained that the court directed Mines to mortgage the entire interest in the Alameda county real estate. This contention is on the theory that the property of the asylum was held in trust because the articles of incorporation, signed by two of the plaintiffs and by the defendant, declared that all the property of the asylum should be held in trust by said corporation for the use and benefit of the society; that Ferry and McCarthy were members of the society as much as were Mines, Lyman, and Wall, and that one rule of the society declared that "no sister may own anything herself, not even the superior, but is only the administrator of the property be-

longing to the community." There is nothing in the evidence
to show that Ferry and McCarthy had any interest in the Ala-
meda property, and as there is no corporation there is no title
or interest in it. The terms of the settlement placed the full
legal title of the Alameda property in Mines by the deed of
Lyman to her; the society as such was not a party to the ac-
tion and its interests as such, apart from the corporation, were
not drawn in question. We see no error in this action of the
court. In this connection may be noticed that the court found
that the "compromise and settlement was put in writing, and
was duly signed and executed by all the parties to said firstly
commenced action and was also signed and executed by all their
attorneys of record," and elsewhere it was found that "Ferry
and McCarthy agreed to each and all the terms of said compro-
mise and settlement, and all the considerations thereof"; and
again it is found that "it is not true that said agreement and
stipulation was not executed or authorized by Bridget Ferry
and Annie McCarthy, . . . . but, on the contrary, finds that
said stipulation was signed by Messrs. Sullivan & Sullivan, at-
torneys in said firstly commenced action for said Mines, Ferry,
and McCarthy, and for the Girls' Directory Orphan Asylum,
a corporation, and at said times said Sullivan & Sullivan were
attorneys of record in said first commenced action for said
Mines, Ferry, and McCarthy, . . . . and that although not
signed by said Ferry and McCarthy said stipulation was, and
the contents thereof were, fully known to them, and fully au-
thorized by them, and agreed to by each and both of them."
Appellants claim that the evidence is insufficient to support
these findings. As found by the court, Ferry and McCarthy
did not sign the stipulation, but the evidence supports the find-
ings that their attorneys did sign for them and by their au-
thority and with their consent. Section 283 of the Code of
Civil Procedure is cited to show that the attorneys of Ferry
and McCarthy had no authority to enter into the stipulation.
This section "was not intended to enlarge or abridge the au-
thority of the attorney, but only to prescribe the manner of its
exercise" (*Preston v. Hill*, 50 Cal. 53[4]); and the stipulation
may be enforced although not entered in the minutes of the

---

[4] 19 Am. Rep. 647.

court, if oral, or filed with the clerk, if written (*Smith v. Whittier*, 95 Cal. 279); unless forbidden by some other statute or by some principle of law, and we know of none. Ferry and McCarthy had no interest in any of the property as members of the alleged corporation, for the corporation had no interest in it. What their interest was, as members of the society, we do not know, for none was shown as such members, and no issue was presented in the case as to the rights of the society as an unincorporated body or as to the members of any such society. But aside from these considerations, Ferry and McCarthy were not parties to this action and are not bound by the judgment in it. Appellants cannot be heard to complain because of any finding as to Ferry and McCarthy.

5. It is claimed that the court erred in finding that there was no valid delivery by Mines to the corporation of the deeds of the San Francisco and Alameda county property. The evidence was that Mines executed and acknowledged the deeds some days after entering into the compromise agreement and avowedly to defeat its object; the deeds were taken by R. C. Royce (by whose direction does not appear) from the hands of the notary who took the acknowledgment, and by Royce were delivered to the recorder, and later Ferry got them and they were put in a drawer in the asylum without delivery to anybody, and there remained until called for in this suit. Whether Royce was at the time the attorney of Mines or the corporation does not appear. There was no corporation and no officer of the grantee corporation to whom delivery could be or was made, or who was capable of subsequently manifesting acceptance, express or implied.

Conceding that the intention of the grantor, Mines, was to deliver the deed to the corporation, there could be no valid delivery where there was no grantee *in esse;* and the same may be said in answer to the proposition that acceptance will be presumed on the part of the grantee from the beneficial character of the grant, and also as to the other circumstances suggested by appellants.

6. It is urged that the compromise agreement was void because two of the parties to it, Griffith and Schumann, were minors under the age of eighteen, and the contract affected

real estate in which they had an interest. The evidence showed that these minors were represented by O. F. Weldon as guardian *ad litem,* duly appointed, and they had no general guardian; this guardian assisted in negotiating the compromise, and the agreements were executed with his consent and in his presence and by his express authority; they came of age before the trial closed and by deed and in open court ratified all that had been done; they participated in the subsequent efforts to induce Mines to carry out her contracts.

It was competent for Griffith and Schumann to ratify what had been done in their behalf, and this they did in the most solemn manner by declaration in writing and on the witness stand in the presence of the court at the trial. Whether their guardian *ad litem* had authority to bind them, which appellants deny, is not material in view of the subsequent ratification, after they came of age, of all his acts and of all other acts done in their behalf or which in any way affected them.

7. Error is urged in permitting the plaintiffs to file a cross-complaint to the complaint in intervention. The objection seems to be that by section 442 of the Code of Civil Procedure only a defendant may file a cross-complaint; that section 387 of the Code of Civil Procedure, which provides for intervention, contains no provision for a cross-complaint, and, as by section 442 only a defendant may file a cross-complaint, there is no authority for a cross-complaint to an intervention. Section 387 treats the intervention as a complaint to which either party to the action "may answer or demur . . . . as if it were an original complaint." The intervention may be adverse to both plaintiff and defendant. Where it is adverse to either such party becomes defendant, and the intervenor plaintiff in the intervention, and such defendant then has all the rights to plead given to defendants in an ordinary action, and may file a cross-complaint to the intervention under section 442, *supra.*

8. The court found that the consideration moving to Mines, Ferry, and McCarthy for the execution on their part of the compromise and agreement was adequate, fair, and reasonable, under which Mines was to receive, with the knowledge and consent of Ferry and McCarthy, the title and possession of all the

assets and lands referred to, and "which were then and now of the value of $50,000 and upward." It is true that no provision is made for Ferry and McCarthy in the division of the spoils of this suit, but as they are not parties to it or bound by it appellants cannot complain; and as to Mines, the consideration seems quite adequate. How far Ferry and McCarthy would be bound by the stipulation and agreement should they hereafter attempt to assert any rights or interest in the property we express no opinion; apparently, they have cast their lot with Mines and remain, as heretofore, with her to assist in managing the asylum. Nor do we intend to express any opinion as to the rights of the Girls' Directory Orphan Asylum as an unincorporated society, nor of the members thereof other than those whose rights are now before us; nor as to the rights of the state, or of the charitably disposed persons who have contributed so liberally to the upbuilding of an institution the legal title to which is in Mines. The result of this litigation leaves this valuable property in the absolute control of Mines, with power to do with it as she may will. We should be glad to find some way in this case to declare the charitable use with which the property is morally, if not legally, impressed, but we see no way to do so under the pleadings or the evidence.

Having given attention to all the various questions presented by appellants which seem to call for notice, and finding no prejudicial error in the record, it is recommended that the order be affirmed.

Haynes, C., and Gray, C., concurred.

For the reasons given in the foregoing opinion the order is affirmed.          McFarland, J., Temple, J., Henshaw, J.