[Sac. No. 2077.   In Bank.—March 5, 1915.]

VALLEJO AND NORTHERN RAILROAD COMPANY, Respondent, v. REED ORCHARD COMPANY et al., Appellants.

APPEAL—REVIEW OF EVIDENCE—SECTION 4½ OF ARTICLE VI OF CONSTITUTION—LIMITATION ON JURISDICTION.—It has always been the desire and policy of the supreme court to disregard unimportant and unsubstantial errors appearing in the record, and to reverse causes only for reasons affecting the merits of the case and the substantial rights of the parties.   Prior to the recent amendment of section 4½ of article VI of the constitution, its power to do so has been somewhat limited by the limitations upon its jurisdiction to consider the evidence.

ID.—CONSTITUTIONAL CHANGE AFFECTS BOTH CIVIL AND CRIMINAL CASES —INJURY NO LONGER PRESUMED FROM ERROR.—Since the amendment of section 4½ of article VI of the constitution, now applicable in civil as well as criminal cases, it is the duty of the appellate court to review conflicting evidence for the purpose of ascer-

taining whether or not an error "has resulted in a miscarriage of justice," and to disregard a manifest error, when, upon such examination, it shall not be of the opinion that the error complained of has resulted in a miscarriage of justice. Injury is no longer presumed from error, but must appear affirmatively to the mind of the court after the examination required, or from the nature of the error itself.

Id.—Constitutional Provision Applicable to Pending Cases.—Such amendment applies to pending appeals, submitted prior to its adoption. A party has no contractual or vested right to have a judgment reversed because of an error which the court cannot say has produced what that section describes as a "miscarriage of justice."

Id.—Meaning of Phrase "Miscarriage of Justice."—Just what may be included in the phrase "miscarriage of justice" is to be determined in each particular case as it is presented. No precise definition can be given to it.

Eminent Domain—Right to Jury Trial—Issue of Compensation.— The constitution gives to the defendants in a condemnation suit the absolute right to a jury trial of the issue of compensation; but the legislature is left free to provide as it may see fit for the method of trial of other issues.

Id.—Constitutional Right to Jury Trial—Section 592 of Code of Civil Procedure.—Section 592 of the Code of Civil Procedure as amended in 1874 limits the right to a jury trial to common law actions.

Id.—Verdict of Jury When Advisory.—The verdict of a jury in a case in which trial by jury is not a right is advisory to the court, and findings by the court are necessary to complete the record.

Id.—Condemnation Suit a Special Proceeding—Issues Other Than Compensation Triable by Court—Findings Required on Special Verdict.—A condemnation suit is a special proceeding and not within the classes in which, under section 592 of the Code of Civil Procedure, a jury trial is required. Except those relating to compensation, the issues of fact in a condemnation suit are to be tried by the court, and if the court submits them to a jury it must make findings either by adopting the verdict thereon or by making findings in its own language.

Id.—Error in Instructions When Prejudicial—Findings Made by Court.—Error in instructions, in a condemnation suit, upon other issues than that of compensation, and upon which the court has itself weighed the evidence and made findings, would not justify a reversal, unless upon the whole case, including the evidence, the appellate court finds that it caused substantial injury or a miscarriage of justice.

Id.—Condemnation of Land for Railroad—Cost of Fences—Omission from Verdict—Premature Judgment Entered by Clerk—

Subsequent Judgment on Findings of Court.—Section 1248 of the Code of Civil Procedure, requires that in a suit to condemn land for a railroad the court or jury shall find the cost of fences and of cattle guards. A preliminary judgment entered by the clerk of the court upon a verdict silent on this point is prematurely entered and of no effect, as against a later judgment in the same case made upon findings and conclusions by the court upon the matters before it, including the matter of fences, etc.

Id.—Juror—Employee of Another Railroad—Challenge.—In such a suit if a juror on his *voir dire* being employed by another railroad, admits that his employment might influence his verdict, it is proper to excuse him on the plaintiff's challenge; and, although he may have contradicted himself on the point, that fact does not affect the question so far as concerns the action of the supreme court on appeal.

Id.—Passing Panel for Cause—Peremptory Challenge—Discretion.—After a jury panel is filled and all the jurors have been examined and passed for cause by both parties the court may, in its discretion, permit the plaintiff to exercise its remaining peremptory challenge.

Id.—Irrelevant Examination of Juror.—In a condemnation suit a proposed juror may not be asked how, in the absence of evidence on the subject, he would determine the extent of the plaintiff's ability to pay for the land; the question of the plaintiff's ability to pay is irrelevant to the examination on the *voir dire.*

Id.—Opening Statement of Plaintiff—Unprejudicial Remarks.— When, in a suit for the condemnation of land for a railroad, the answer denies any intention on the part of the plaintiff to build a railroad and alleges the real intention to be the acquiring of the defendant's land not for any public use, it is not error for the court to overrule an objection by the defendant to comments in the plaintiff's opening statement, on the opposition and difficulties the plaintiff has encountered in building its line to this land, and its persistence in its purpose nevertheless; since the matters so commented upon tend to show good faith in the plaintiff; and the circumstance that the comments may harm the defendant does not render their being made misconduct, provided the making of them is in good faith.

Id.—Attack on Plaintiff's Corporate Existence—Similarity of Name.—Where the plaintiff does business as a corporation under a name stated in a certificate of incorporation issued by the secretary of state, and in good faith claims to be legally incorporated thereby, it is a *de facto* corporation claiming to be one *de jure,* and its right to exercise corporate powers can be inquired into only by the state. The fact that a pre-existing corporation has a similar name is no ground, in such a case, for excluding its articles, when offered in evidence.

ID.—EVIDENCE OF CORPORATE EXISTENCE—BONA FIDES OF PLAINTIFF AS TO PUBLIC USE.—Where defendant denied corporate existence of plaintiff it was not error to admit evidence tending to show that plaintiff was a *de facto* corporation, and tending to prove the *bona fides* of the corporation in condemnation proceedings, even though the articles of incorporation admitted were sufficient *prima facie* to show its legal corporate existence.

ID.—DEFENSE OF PRIVATE USE—EVIDENCE TO COMBAT.—Land can only be taken for a public use and if plaintiff condemning land for public use really intends to devote it to a private use, this, if proven, would be sufficient to defeat the action, and where such private use is in issue error cannot be predicated upon the admission of evidence to disprove it.

ID.—EVIDENCE AS TO NECESSITY OF TAKING.—Evidence that plaintiff had planned a railroad system composed of several branches, and that the proposed route over defendant's land was a part of that system, and that in pursuance of that plan it had constructed other parts of that system, was proper to be considered upon the question of the necessity for taking.

ID.—EVIDENCE AS TO OBSTACLES TO PREVENT BUILDING OF ROAD.—Testimony by the president of the plaintiff company describing his efforts to overcome obstacles to the building of the proposed road and in defeating the opposition to the enterprise tended to show that plaintiff sought to acquire the land for railroad purposes in good faith.

ID.—EVIDENCE—ADMISSIBILITY—COLLATERAL EFFECTS.—Evidence properly admissible upon the issues presented cannot be excluded because it may have ulterior or collateral effects detrimental to one of the parties.

ID.—RIGHT OF RAILROAD TO CONDEMN LAND FOR FREIGHT SHEDS.—Under section 465 of the Civil Code, subd. 7, empowering a railroad to acquire by condemnation the lands and other property "to be used in the construction and maintenance of its road, and all necessary appendages and adjuncts" thereto, a railroad company can condemn land for freight sheds to be used for the convenient operation of its road in the transportation of freight.

ID.—STATUTORY AUTHORIZATION FOR CONDEMNATION OF LAND FOR WHARVES.—Section 1238 of the Code of Civil Procedure authorizes the condemnation of land for wharves, docks, piers, and chutes, and where a railroad extends to a navigable river, wharves for the convenient transfer of freight between the cars upon the railroad tracks and the boats plying upon the river may reasonably be said to be necessary for the convenient operation of such railroad and land may be taken for such purpose under section 465 of the Civil Code.

ID.—CONSTRUCTION OF STATUTES APPLICABLE TO WHARVES AND RAILROADS.—Sections 528–531 of the Civil Code, dealing with "bridges, ferries, wharves, chutes, and pier corporations, constituting Title VI,

Part IV, Division I, are to be construed in connection with Title III, relating exclusively to railroad corporations, in which section 465 is found, and when so construed, it is apparent that Title VI was not intended to apply to corporations formed under Title III, for the purpose of constructing and operating railroads.

ID.—RAILROAD COMPANY NEED NOT OBTAIN WHARF FRANCHISE.—The legislature never intended that railroad companies must obtain, within six months after filing of articles of incorporation, wharf franchises from authorities in control of navigable rivers, over which the railroad should pass, and of every terminal at tide water, or cease to be corporations if they failed to do so.

ID.—RIGHT OF RAILROAD COMPANIES TO MAINTAIN WHARVES—STATUTORY PROVISIONS.—Nothing in section 2921 of the Political Code prohibits a railroad company from constructing and operating wharves for its own business, without authority from the board of supervisors, at places where the railroad extends to navigable water and where such wharves are necessary for the successful operation of its railroad.

ID.—CONSTITUTIONAL RESTRICTION AGAINST EXCLUDING RIGHT OF WAY TO NAVIGABLE WATER—PUBLIC USE CONSERVED BY RAILROAD WHARF. The use of such wharves by a railroad company would not exclude the right of way for public purposes, in contravention of section 2, article XV of the constitution, because their use as such would constitute one of the public purposes protected by such provision of the constitution.

ID.—AREA REQUIRED FOR WHARVES FOR FUTURE BUSINESS—INSTRUCTIONS.—Where articles of incorporation give a railroad company power to own and run steamers, it was not prejudicial to instruct the jury that the railroad company had a right to own and hold steamers and use them in connection with its railroad and condemn land necessary for the accommodation of steamers.

ID.—PLEADING—INSTRUCTIONS—EVIDENCE.—Where there is a general allegation that land to be taken is all necessary for the proposed railroad and there were specific allegations that certain parts of the tract were necessary for specified uses pertaining to the construction or operation of the road, it was not error to instruct the jury that they could allow such quantity of land for wharves as they should believe reasonably necessary to accomodate the future business of the road in delivering and receiving freight to and from its cars to such steamers as they believed would probably be plying upon the river. Evidence as to the probability of business from that source held properly admitted.

ID.—NECESSITY OF TAKING—EVIDENCE.—On the question of necessity of taking land for railroad purposes evidence was admissible showing nature of country, territory contributing freight and passengers, the products of such territory, the probable future growth, and possible volume of passenger traffic.

Id.—Evidence as to Proposed Connection With Another Railroad.—
Where on cross-examination the president of a railroad company
condemning land has testified that another company proposes to
build a connecting line, and the party cross-examining has sought
to establish by the witness that part of the land to be taken is for
the benefit of such other company, the witness should be permitted
on redirect examination to testify that the other road has its line
in course of construction and that plaintiff will obtain business from
it when completed.

Id.—Opinion Evidence as to Probable Amount of Business—Rail-
road Business a "Trade."—The effect of electric roads in the set-
tlement and development of the country they penetrate and in ob-
taining traffic previously going to other railroads is not a matter of
common knowledge, and opinion evidence by a witness having actual
experience with the subject as to what proportion of the products
of the territory through which the proposed road passed would be
shipped over the plaintiff's road when constructed, was properly ad-
missible. The business of operating a railroad is deemed a "trade"
within the meaning of subd. 9 of section 1870 of the Code of Civil
Procedure, allowing opinion evidence.

Id.—Reports of State Agricultural Society—Evidence.—The report
of the state agricultural society, when printed by order of the state
board of examiners, is a public document, and admissible in evi-
dence as such. It constitutes legal evidence although not conclusive,
of the facts therein stated regarding the products of the state and
its subdivisions.

Id.—Intention to Operate Railroad by Electricity—Circumstantial
Evidence.—The intention of a railroad company to operate its road
by electricity can be shown by circumstantial evidence, as well as
direct.

Id.—Reclaimed and Unreclaimed Lands Contiguous to Road—Expert
Evidence — Proper Foundation — Map Showing Character of
Land.—Where witness is shown to be a competent and experienced
civil engineer and familiar with the country contiguous to the pro-
posed road, there is sufficient foundation laid to qualify such witness
to state approximately the respective areas of reclaimed and un-
reclaimed land within such country, and for the introduction in
evidence of a map purporting to delineate such lands, prepared by
the witness partly from his own observation and partly from offi-
cial sources. Such evidence had some bearing, although somewhat
remote, upon the question of the future business of the road and the
necessity for taking, and it was within the discretion of the court
to allow it.

Id.—Amount of Freight Handled—Evidence.—The opinion of wit-
nesses based upon investigations made by inquiries of shippers and
others engaged in the freighting business from other sources as to
the approximate amount of freight handled at the terminal point of

plaintiff's railroad was proper evidence of the facts necessary to determine the question of necessity.

ID.—REDIRECT EXAMINATION—EXPLANATION BY—REPORT USED BY WITNESS IN PREPARING PLANS FOR TRACKS.—Where witness, the engineer who planned plaintiff's tracks and other structures on the land in controversy, testifies on direct examination as to the various uses the several tracks were to be put, and on cross-examination the attempt is made to show that he made the plans larger than necessary, it is permissible on redirect examination to introduce in evidence a report made to the plaintiff and used by the witness in making his plans, for the limited purpose of explaining why the witness has fixed upon the land sought to be condemned as the area of land necessary for plaintiff's use.

ID.—OPINION EVIDENCE — QUALIFICATION OF WITNESSES — RULING OF TRIAL COURT—REVIEW ON APPEAL.—The question whether or not a witness is qualified to give his opinion, as evidence upon a matter in issue, is submitted to the trial judge in the first instance, and is to be determined by him before such opinion may be given. It is in the nature of a trial of a question of fact by evidence addressed to the judge alone, and as in other decisions on questions of fact by a trial court, his ruling thereon was a matter of discretion and will not be overturned on appeal unless there is an actual want of evidence to support it or a clear abuse of discretion.

ID.—INSTRUCTIONS—PUBLIC INTEREST—JUST COMPENSATION.—An instruction stating that as the power of eminent domain is necessary for the public good, "it would be unjust to the public that the plaintiff should be required to pay the owner more than a fair indemnity for the loss he sustains by the appropriation of his property for the general good. On the other hand, the owner being compelled to part with his property, whether he desires to sell or not, the law allows him just compensation therefor," was not improper, the same, in substance, charging the jury that they should allow the owner of the land just compensation and that public interest demanded that he should receive no more.

ID.—FIXING VALUE OF LAND—GENERAL KNOWLEDGE OF JURY—INSTRUCTIONS.—An instruction directing the jury to weigh the testimony of witnesses giving opinions as to value "by reference to the whole situation of the property and its surroundings, and all the surrounding circumstances, and by applying it to your own experience and knowledge. While you cannot act in any case upon particular facts material to its disposition resting in your private knowledge, but should be governed by the evidence adduced, you may and should judge of the weight and force of the evidence upon your own general knowledge of the subject of the inquiry," is not improper.

ID.—PROBABLE AREA REQUIRED FOR TERMINAL—NECESSITY—INSTRUCTIONS.—It was not error to instruct the jury that in determining questions of necessity they should take into consideration the character of the business proposed to be done by plaintiff's railroad, the

manner of doing it, the future needs of communities plaintiff would serve and the number of persons to be served, as these things had direct bearing upon the probable area required for its terminal.

ID.—NECESSITY FOR TAKING—AMBIGUOUS INSTRUCTIONS WITHOUT PREJUDICE.—Certain instructions on the question of the necessity of taking a specific strip of land for the purposes of the plaintiff's tracts, and other instructions on the general subject of the necessity for the taking, even if they be deemed ambiguous or erroneous, are held not to have been prejudicial or misleading.

ID.—DATE OF FIXING VALUE OF LAND—AMENDMENT OF 1911—CONSTITUTIONAL LAW.—Where an action was commenced and summons issued May 5, 1910, an instruction that the jury in determining the compensation to be given must consider the value of the land as it was at the date of the commencement of the action, is correct and in accordance with section 1249 of the Code of Civil Procedure as it then stood, and the amendment of said section effective June 9, 1911, is not applicable to the present case. The portion of the amendment making the proviso inapplicable to pending litigation is not unconstitutional as class legislation. Even if invalid the entire proviso would have to be eliminated and the section would stand as it was before amendment, so that in either case the instruction was correct.

ID.—FORM OF JUDGMENT—AWARD OF EASEMENT AND FEE IN LAND—PERMANENT BUILDINGS.—Under section 1239 of the Code of Civil Procedure, a judgment condemning land for railroad purposes is proper when it awards only an easement in the land for the right of way for the various kinds of tracks, and the fee for that part of the land to be used for a storehouse, a blacksmith shop, a machine shop, wharves, offices, and other purposes requiring the construction of substantial buildings thereon. Such structures are "permanent buildings" within the meaning of that section.

APPEAL from judgments of the Superior Court of Yolo County. N. A. Hawkins, Judge.

The facts are stated in the opinion of the court.

Arthur C. Huston, White, Miller & McLaughlin, and White, Miller, Needham & Harber, for Appellants.

T. T. C. Gregory, Elmer W. Armfield, John S. Partridge, C. J. Goodell, Pillsbury, Madison & Sutro, and Héller, Powers & Ehrman, for Respondent.

SHAW, J.—This is an action to condemn for public use certain real property belonging to the Reed Orchard Company. S. Komano, a lessee of parts of the land, and People's

Savings Bank, a mortgagee, were made defendants and suffered default. Reed Orchard Company answered the complaint, there was a trial by the court and jury resulting in a general verdict and also a special verdict upon a part of the issues and findings by the court, and thereupon divers judgments and orders were entered.

The verdict was rendered on March 22, 1912. The record shows that on the following day, March 23d, a judgment was entered by the clerk, reciting the verdicts in full and adjudging that the plaintiff "do have judgment, condemning for the uses of said plaintiff as specified" in the complaint, a certain parcel of land described, and that the defendants recover of the plaintiff the sum of $104,100, being the value of the parcel of land as fixed by the verdict, together with costs. From this judgment the defendants separately appeal, each of said appeals being taken by a notice filed less than sixty days after the entry of said judgment.

After the trial, the court proceeded to make elaborate findings, embracing the verdicts of the jury and many other facts in issue. These findings were filed on April 18, 1912, and thereupon, on the same day, there was entered an order entitled "Preliminary order and judgment of condemnation," signed by the judge. This order declared that there were condemned for plaintiff a number of parcels of the property, embracing all the land sought to be condemned, describing them, each to be used for a specified purpose, and further that, upon the payment or deposit in court by plaintiff of one hundred and four thousand one hundred dollars for the defendants, the plaintiff would be entitled to a final order and judgment of condemnation. From this order the said defendants also appeal.

On April 29, 1912, a final order of condemnation was filed and entered. This order recited that the plaintiff had, on April 18, 1912, paid into court for the defendants the said sum of one hundred and four thousand one hundred dollars, together with the costs as taxed, and further alleged that the parcels of property, describing them, be condemned for plaintiff for certain specified purposes. From this order the said defendants each appeal.

1. Before considering the points presented, it is important to note that since this case was submitted to this court the people have adopted an amendment of section 4½ of article

VI of the constitution, whereby that section is made applicable in civil as well as criminal cases.    It now reads as follows:

"No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

It has always been the desire and policy of this court to disregard unimportant and unsubstantial errors appearing in the record, and to reverse causes only for reasons affecting the merits of the case and the substantial rights of the parties. Our power to do this has hitherto been somewhat limited by the limitations upon our jurisdiction to consider the evidence. (*San Jose Ranch Co.* v. *San Jose etc. Co.*, 126 Cal. 324, [58 Pac. 824].)    An important result of the aforesaid amendment is that it enlarges our jurisdiction in that particular.    Prior to its adoption, if the evidence was in substantial conflict as to a fact in issue we were concluded by the decision of the trial court thereon for all purposes of the case, unless the error entered into and affected the consideration of that evidence. Under the above section, we have the power to review conflicting evidence for the purpose of ascertaining whether or not an error "has resulted in a miscarriage of justice."    It is indeed made our duty to do so, and the further duty is imposed to disregard a manifest error when, upon such examination, we shall not "be of the opinion that the error complained of has resulted in a miscarriage of justice."    It is no longer the case that injury is presumed from error; the injury must appear affirmatively to the mind of the court after the examination required, or from the nature of the error itself.    (*People* v. *O'Bryan*, 165 Cal. 55, 66, [130 Pac. 1042].)    This amended section is now in force and binding upon the courts of appeal. And as it affects the remedy only, it applies to pending appeals, although they may have been submitted prior to its adoption.    A party has no contractual or vested right to have a judgment reversed because of an error which the court cannot say has produced what that section describes as a "miscarriage of justice."    (*People* v. *Campbell*, 59 Cal. 245, [43 Am. Rep. 257]; *Kerckhoff etc. Co.* v. *Olmstead*, 85 Cal. 85,

[24 Pac. 648].)   Doubtless the people could, by constitutional amendment, abolish the right of appeal and require the dismissal of appeals remaining undetermined.   Just what may be included in the phrase, "miscarriage of justice," must remain to be decided in each case as it is presented.   No precise definition can be given to it.

It is also necessary in the same connection to determine a question relating to the right to a jury trial in condemnation suits and the procedure followed in this case.

Section 14 of article I of the constitution, provides that in condemnation cases compensation to the owner shall be ascertained by a jury unless a jury trial is waived.   So far as that issue is concerned, therefore, the defendants had an absolute right to a jury trial.   But the section says nothing concerning the mode of determining the other facts necessary to establish the right of the plaintiff to take the property in question.   In effect, it. leaves the legislature free to provide the method of trial of all questions except that of compensation.   The legislative provision on the subject is found in section 592 of the Code of Civil Procedure.

In *Wilmington* v. *Dominguez,* 56 Cal. 505, the court decided that the owner, under this section, as it then stood, was entitled to a jury trial of all the issues in a condemnation suit. At the time of the trial in that case, section 592, on this subject, read thus: "An issue of fact must be tried by a jury, unless a jury trial is waived, or a reference is ordered, as provided in this code."   The court held that this provision governed the case and that the trial court could not disregard the verdict of a jury and make findings of fact contrary thereto upon the question of the necessity of the taking.   This case was followed in *Cummings* v. *Peters,* 56 Cal. 597, without discussion.   The record in the latter case does not show when the trial took place.   In 1874, section 592 was amended to its present form, which is as follows:

"In actions for the recovery of specific, real, or personal property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury, unless a jury trial is waived or a reference is ordered, as provided in this code.   Where in these cases there are issues both of law and fact, the issue of law must be first disposed of.   In other cases, issues of fact must be tried by the court, subject to its

power to order any such issue to be tried by a jury, or to be referred to a referee, as provided in this code."

It is evident that this amendment made a radical change regarding the right to a jury trial. Under its provisions, in all actions except those enumerated in the opening clause, the issues of fact are to be tried by the court. The language is too clear on this point to require interpretation or to permit construction. The amendment was evidently framed with a view of adopting the principle decided in *Koppikus* v. *State,* 16 Cal. 248, that is, that the constitutional guaranty of the right to jury trial, in section 7, of article I, applies only to common law actions and that it does not confer such right with respect to any action as to which it did not previously exist. Accordingly, it has always been held that this guaranty does not secure the right in special proceedings. (*Dorsey* v. *Barry,* 24 Cal. 453; *Heyneman* v. *Blake,* 19 Cal. 596.) The Koppikus case and many others hold that the verdict of a jury, in a case where a jury trial is not a matter of right, is advisory to the court and that findings by the court are necessary to complete the record. (*Waring* v. *Freear,* 64 Cal. 55, [28 Pac. 115]; *McLaughlin* v. *Del Re,* 64 Cal. 473, [2 Pac. 244]; *Curnow* v. *Blue Gravel etc. Co.,* 68 Cal. 264, [9 Pac. 149]; *Santa Cruz etc. Co.* v. *Bowie,* 104 Cal. 288, [37 Pac. 934]; *McCarthy* v. *Gaston,* 144 Cal. 546, [78 Pac. 7].) A condemnation suit is a special proceeding. It is not included in the classes mentioned in section 592 in which a jury trial is required. That section is expressly made applicable to condemnation suits. (Code Civ. Proc., sec. 1256.) It follows that, except those relating to compensation, the issues of fact in a condemnation suit, are to be tried by the court, and that if the court submits them to a jury it is nevertheless required to make findings either by adopting the verdict thereon or by making findings in its own language.

Subsequent decisions recognize the fact that the aforesaid amendment changed the effect of the section as applied to condemnation suits, so that a jury trial is imperative, if not waived, only with respect to the issue of compensation. Thus, in *California S. R. R. Co.* v. *Southern Pacific R. R. Co.,* 67 Cal. 62, [7 Pac. 123], which appears to have been a closely contested case, the court says: "So far as the assessment of the value of the property to be taken is concerned (while perhaps a new trial of the question of value may be allowed by

the court) the verdict of the jury is conclusive. (Const., art. I, sec. 14.) As to other issues of fact made by the pleadings, the court is authorized by the Code of Civil Procedure to submit them to a jury." In *Weber* v. *Santa Clara*, 59 Cal. 266, the court says: "The owner of property is entitled to a jury trial for the purpose of ascertaining the amount of damages which he will sustain by the appropriation of his property to public use," citing section 14 of article I, aforesaid. The context shows that the court was referring only to the issue of compensation. In other jurisdictions having substantially identical constitutional and statutory provisions on the subject, it has been held that all the issues except that of compensation must be determined by the court. (*Bigelou* v. *Draper*, 6 N. D. 166, [69 N. W. 570]; *In re Bradley*, 108 Iowa, 478, [79 N. W. 280].)

The decision in *Santa Ana* v. *Gildmacher*, 133 Cal. 395, [65 Pac. 883], might seem contrary to these views, but an examination of the opinion shows that the point upon which our conclusion rests was neither discussed nor decided in the case. The opinion merely applies the familiar rule that a direction to the jury to render a verdict on a question of fact submitted to it, where there was substantial evidence to justify a contrary decision thereon, is an invasion of the province of the jury and contrary to the constitutional provision that judges shall not charge juries with respect to matters of fact. The judgment was reversed for that reason alone. The action was a suit in condemnation, but the point that the court was not required to follow the decision of the jury on the issue of necessity nor to submit that issue to the jury at all, was not mentioned, nor was section 592 referred to. We are unwilling to believe that the court would have gone so far as to disregard its plain language if that section had been called to its attention. The case cannot be regarded as a decision that the owner is entitled as of right to a jury trial upon all the issues that may be presented in an action of condemnation. It does not purport to decide that question. If it so held we should feel obliged to overrule the decision as contrary to the statutory law on the subject.

As a result of these propositions the conclusion follows that error in instructions, in a condemnation suit, upon other issues than that of compensation, and upon which the court has itself weighed the evidence and made findings, would not

justify a reversal, unless upon the whole case, including the
evidence, we find that it has caused substantial injury, or a
miscarriage of justice.

In the present case, while the court submitted most of the
questions in issue to the jury, it did not consider itself bound
thereby, with respect to other propositions than that of value,
but proceeded thereafter to make its own findings and conclu-
sions of law, covering many facts not expressly included in
the special verdict. These were filed on April 18th, as above
stated, and judgment was accordingly entered thereon. The
code requires, in a case of land taken for a railroad, that the
jury, or the court, shall find the cost of fences along the line
of the road and of cattle guards where fences cross the line.
This is necessary, in order to adjust the amount of compen-
sation the owner may receive. (Code Civ. Proc., sec. 1248.)
The interrogatories submitted to the jury did not include
these questions and there is no finding by the jury on those
points. The court made a finding that no fences or cattle
guards were necessary. This completed the findings required
in order to lay the foundation for the preliminary judgment.
We regard the judgment entered by the clerk on March 23,
1912, as premature and without authority or effect, for, upon
the facts stated, the trial was not then concluded. Probably
it would have become effective, if the court below had adopted
and ratified it and the regularity of the proceedings was not
attacked by an appeal. But it is evident that the court below
did not regard it as effective, for it held the case under ad-
visement for several weeks and then, as above stated, made
full findings upon the evidence and gave its own judgment
thereon. We must therefore presume that the court itself
weighed the evidence and determined all questions of fact,
except that of compensation.

A large number of the rulings of the court are assigned
as error. We will take them up as nearly as possible in the
order in which they occur in appellants' briefs.

2. We first take up the rulings made during the selection
of the jury.

Upon the examination of the jurors on their *voir dire*, the
juror Cook admitted that the fact of his employment by an-
other railroad company might influence his verdict. This
being the case he was properly excused on the challenge of
the plaintiff. The fact that he contradicted this in other

parts of his examination does not affect the question, so far as the action of this court on appeal is concerned.

It was within the discretion of the court to permit the plaintiff to exercise its remaining peremptory challenge after the panel was filled and all the jurors had been examined and passed for cause by both parties. (*Silcox* v. *Lang*, 78 Cal. 123, [20 Pac. 297]) ; *Vance* v. *Richardson*, 110 Cal. 416, [42 Pac. 909], decides nothing contrary to this. Of course, the discretion might in some cases be abused, but there is no showing of any abuse here.

The juror Roth was asked how, in the absence of evidence on the subject he would determine how much the plaintiff could afford to pay for the land to be taken. This question was properly excluded. The jury were to consider and determine the value of the land. The ability of the plaintiff to pay such value was wholly irrelevant to that issue.

3. The answer alleged that the plaintiff did not intend to construct the proposed railroad or any railroad whatever, and that it had begun the action for the purpose of acquiring the defendant's land and not for any public use whatever, nor in good faith. In the opening statement plaintiff's attorney referred to divers previous occurrences tending to show that the plaintiff had encountered opposition and difficulty in building its line to this land, but that it had persisted in its purpose nevertheless. The difficulty and opposition referred to might also, in some degree, have tended to excite sympathy for the plaintiff and animosity toward the opposition. The defendants' objection to the statements was overruled. They assign the ruling as error and the statements as misconduct of the prevailing party. The facts referred to were proper for the purpose of showing that the plaintiff in good faith intended to build the proposed railroad over the lands sought to be taken. The circumstance that it might also produce other collateral consequences harmful to the defendants did not make the statements misconduct or the ruling erroneous, at all events, not unless the statements were made in bad faith for the purpose of improperly influencing the court or jury against the defendants. Bad faith was not shown.

4. The defendants objected to the introduction of the articles of incorporation of the plaintiff, on the ground that the name of the plaintiff so closely resembled that of a pre-existing corporation, that it would tend to deceive, and that, therefore,

under section 296 of the Civil Code, the secretary of state should have refused to file said articles. The court was correct in overruling the objection. Whether or not the state of California could in a proper action dissolve the corporation or compel it to change its name on the ground of the misleading character of its name, we need not determine. The evidence showed that the secretary of state had issued the certificate of incorporation. It also appears that thereupon and thereafter the plaintiff company claimed, in good faith, to be a legally organized corporation under the law and was doing business as such under said corporate name. These facts were not disputed. Under these circumstances the plaintiff must be deemed to be, at least, a *de facto* corporation claiming to be a *de jure* corporation. Section 358 of the Civil Code provides that "The due incorporation of any company claiming in good faith to be a corporation under this part, and doing business as such, or its right to exercise corporate powers, shall not be inquired into collaterally in any private suit to which such *de facto* corporation may be a party; but such inquiry may be had at the suit of the state on information of the attorney-general." It follows that the defendant had no authority to interpose this objection to plaintiff's corporate existence. The state alone could do so. (*Lakeside Ditch Co. v. Crane,* 80 Cal. 186, [22 Pac. 76]; *Martin* v. *Deetz,* 102 Cal. 66, [41 Am. St. Rep. 151, 36 Pac. 368]; *Oroville etc. Co.* v. *Plumas Co.,* 37 Cal. 361; *Mokelumne etc. Co.* v. *Woodbury,* 14 Cal. 426, [73 Am. Dec. 658]; *Los Angeles* v. *Spires,* 126 Cal. 544, [58 Pac. 1049]; *San Diego Gas Co.* v. *Frame,* 137 Cal. 443, [70 Pac. 295].) There are many other similar cases. The case of *Wall* v. *Mines,* 130 Cal. 27, [62 Pac. 386], is not in conflict with these decisions. There the company had no *de facto* existence, that is, it was not "doing business as such," or "claiming in good faith to be a corporation under this part," and therefore it did not come within the conditions prescribed in section 358, aforesaid. Here these conditions do exist and the section controls.

5. Over the objection of the defendants a number of instruments and deeds were admitted purporting to convey to the plaintiff the railroad of which the line over the condemned land was to be a part and other property connected therewith, and to grant franchises to the plaintiff over other parts of its line. There was also admitted the plans and specifications

adopted by the plaintiff for work to be done along the line of the railroad and at the terminals thereof and judgments condemning other property along the line for the use of plaintiff in building and operating said railroad. The defendants had denied the corporate existence of the plaintiff. This evidence tended at least to show that the plaintiff was a corporation *de facto*. The mere fact that the plaintiff had introduced its articles of incorporation, as aforesaid, and that they were sufficient *prima facie* to show its legal corporate existence, would not justify us in holding that the court erred in admitting other evidence tending to show the *de facto* existence of the corporation. Such proof, for reasons above stated, was necessary. The evidence also tended to show that the plaintiff had planned a railroad system including a line from Vallejo to Sacramento, that the proposed route over defendant's land was a part of the Sacramento line, and that in pursuance of the plan it had constructed other parts of the line and obtained franchises and rights of way therefor and that it was endeavoring to complete the same. These facts were relevant to the question of the good faith of the plaintiff in proposing to build its road on the land sought to be acquired. This issue was presented by the answer of the defendants, as above stated, and the record shows that the case was tried upon the theory that the question was in issue. We think that it was competent for the defendants, if they were able to do so, to show as a defense that the plaintiff did not really intend to build the proposed road, but was merely proposing to do so as a means whereby to acquire the land through a condemnation suit. Land can only be taken for a public use and if, in fact, the plaintiff claiming a right to condemn land for a public use really intends to devote it to a private use, this, if proven, would be sufficient to defeat the action (*Beveridge* v. *Lewis*, 137 Cal. 621, [92 Am. St. Rep. 188, 59 L. R. A. 581, 67 Pac. 1040, 70 Pac. 1083].) Having presented the issue, the defendants cannot be allowed to predicate error upon the admission of evidence to disprove it. The evidence was also proper to be considered upon the sharply contested question as to the necessity for the taking of the land in controversy. The question whether all of it was necessary depended very much upon the length and character of plaintiff's road and its probable future business. The evidence objected to had some bearing upon these questions.

CLXIX Cal.—36

The fact that it may have tended to prove the issue only in a remote degree does not make it inadmissible.

The same reasons apply to the ruling of the court allowing the president of the plaintiff to testify describing his efforts to overcome the obstacles thrown in the way of the building of the road by other corporations and persons and in defeating the opposition to the enterprise. It all tended to show that the plaintiff had been and was diligently endeavoring to build the portions of the plaintiff's road leading up to the boundaries of the land in question and it had a direct bearing on the contention that the plaintiff was seeking to acquire the land for other purposes than a railroad.

It may be, as claimed, that some of this evidence would tend to create or arouse prejudice against the defendants in favor of the plaintiff by raising a suspicion that other railroad corporations were instigating the defense or obstructing the building of the proposed railroad. But it is a well established rule that if evidence is properly admissible upon the issues presented, it cannot be excluded because it may have ulterior or collateral effects detrimental to one of the parties. It is also very apparent that much time was consumed by counsel, both in examination in chief and on cross-examination of the respective witnesses, in inquiries concerning minute details of these various transactions and matters and that because so much time was devoted to this subject the opposition of other corporations was greatly emphasized. We cannot say, however, that plaintiff's counsel were greater sinners in this respect than those of the defendants. In any event, it does not constitute misconduct sufficient to call for a reversal of the judgment. In view of the persistent and very numerous objections made by defendants' counsel at every stage of plaintiff's case we cannot say that the plaintiff's counsel transgressed the bounds of propriety in making the proof so full and elaborate.

6. It is earnestly contended that the plaintiff failed to show any right to condemn any part of the land to be used as freight wharves and sheds. The plaintiff's articles of incorporation enumerated among its powers the power to build and operate the railroad in question and for that purpose to acquire, own, construct, and use all necessary wharves, docks, and chutes and the land required therefor. The proposed line of railroad was sixty-two miles long, extending from Val-

lejo in Solano County to and into the city of Sacramento. It was to have four branches, one from the town of Fairfield to Suisun, two miles long, one from the town of Cement to Woodland, thirty-five miles long, one from Davisville to Woodland, seventeen miles long, and one to the town of Dixon, three miles long. The line crossed the Sacramento River at a point opposite the city of Sacramento and the bridge for that purpose had its west abutment on the land sought to be condemned. The complaint alleged that the land sought to be taken was necessary for the proposed road and, among other things, for freight wharves and sheds to be used for the said railroad purposes. The plat of the land annexed to the complaint showed that the strip of land abutting on the Sacramento River immediately below the said bridge was to be used for these wharves and sheds. This strip was divided into three parcels by passageways or spaces 100 feet wide extending from the river to the railroad tracks to be laid along and next to the wharves, and the jury, in answer to a special interrogatory, found that it was necessary for the plaintiff to take all of these parcels of land for the said purposes, for the said railroad. The findings of the court are to the same effect. The claim is 1. That the law confers upon a railroad company no right to maintain wharves as a part of the railroad, or for any purpose whatever, or to condemn land for such purposes; and, 2. That in order to obtain such right, the company must first obtain a wharf franchise, in pursuance of sections 528 to 531, inclusive, of the Civil Code, and section 2921 of the Political Code.

Section 1238 of the Code of Civil Procedure authorizes the condemnation of land for wharves, docks, piers, and chutes (subd. 4.) Section 465 of the Civil Code empowers every railroad company to acquire, "hold and use all such real estate and other property as may be absolutely necessary for the construction and maintenance of such railroads, and for all stations, depots and other purposes necessary to successfully work and conduct the business of the road" (subd. 3) ; to construct and maintain such road, "with such appendages and adjuncts as may be necessary for the convenient use of the same" (subd. 4) ; "to erect and maintain all necessary and convenient buildings, stations, depots, fixtures and machinery for the accommodation and use of their passengers, freight and business" (subd. 9) ; and to acquire by condemna-

tion the lands and other property "to be used in the construction and maintenance of its road, and all necessary appendages and adjuncts" th' eto (subd. 7).

There can be no doubt of the right of the plaintiff to condemn land for freight sheds to be used for the convenient operation of its road in the transportation of freight. Such sheds would be a necessary adjunct to the road in carrying on the business of the transportation of freight thereon. There is no serious contention that this would not be so. We think it is equally obvious that where a railroad, intended for the carriage of freight, extends to a navigable river running through a large area of highly productive land and upon which river there is a heavy steamboat traffic in carrying such products, as is the case here, wharves for the convenient transfer of freight between the cars upon the railroad tracks and the boats plying upon the river, may reasonably be said to be necessary for the convenient operation of such railroad, and a necessary appendage or adjunct thereto. (See *Central P. R. Co.* v. *Feldman,* 152 Cal. 306, [92 Pac. 849].) Land for such purpose is reasonably "necessary to successfully work and conduct the business of the road," within the meaning of section 465, aforesaid, and, therefore, by that section, the railroad company is authorized to maintain such wharves and to acquire by condemnation the land necessary for that purpose.

The next contention is that it must first obtain a wharf franchise and that it has failed to do so. Sections 528 to 531 constitute Title VI, Part IV, Division I, of the Civil Code. The code distinguishes this title by the sub-title "Bridges, Ferry, Wharf, Chute, and Pier Corporations." Section 528 declares that "No corporation must construct, or take tolls on a bridge, ferry, wharf, chute, or pier until authority is granted therefor by the supervisors, or other governing body having authority in that behalf." Section 529 declares that "every such corporation ceases to be a body corporate," if, within six months from filing its articles of incorporation, it does not obtain such authority from the proper governing body, or if, within one year thereafter, it has not commenced the construction of the bridge, wharf, chute, or pier, and expended thereon ten per cent of the amount of its capital stock, or if, within three years from filing its articles, the said proposed structure is not completed. Section 530 provides that

the "president and secretary of every bridge, ferry, wharf, chute, or pier corporation" must annually make a report to the supervisors or other governing body which granted its franchise showing the cost of construction, the moneys expended since construction, the capital stock paid in, the yearly receipts, the dividends declared, the indebtedness incurred and such other facts as may be required by such body.   Section 531 provides that if such bridge, ferry, wharf, chute, or pier is built, operated or owned by a natural person the provisions of the title are applicable to such person.   These provisions are to be construed in connection with title III which relates exclusively to railroad corporations and in which section 465 is found, and also in connection with the code titles relating to other classes of corporations, and all are to be construed in such a manner as to make them harmonious if such construction is reasonably apparent.   The terms of the provisions of title VI show that this title, so far as it applies to corporations, was intended to apply only to corporations formed for the purpose of carrying on the business of conducting a public bridge, ferry, wharf, chute, or pier, and that they were not intended to have any application to corporations formed under title III for the purpose of constructing and operating a railroad.   The language throughout is entirely consistent with the sub-title indicating its exclusive application to corporations for the particular purposes named and is inconsistent with any other interpretation. It cannot reasonably be supposed that the legislature intended, with respect to railroad companies, that they should within six months after filing their articles of incorporation, obtain wharf franchises from the proper governing authority in control of every navigable river over which the railroad should pass and of every terminal at tide water, and cease to be corporations if they failed to do so.   To require this as a condition of its corporate existence would be, in practical operation, to prevent the carrying on of any railroad enterprise.   This is a strong indication that no such intent was contemplated by the title referred to.   This construction is further indicated, and indeed rendered almost imperative, by a consideration of the other titles included in part IV. Title I contains general provisions only.   Then follow titles numbered from II to XXII consecutively, besides two titles interpolated subsequent to the original enactment.   Each of

these titles relates to particular classes of corporations exclusively. Thus, title II relates to insurance corporations, title III to railroad corporations, title IV to street railroad corporations, title V to wagon road corporations, title VI to bridge, ferry, wharf, chute, and pier corporations, title VII to telegraph and telephone corporations, title VIII to water and canal corporations, and so on through the list. From this it is quite clear that title VI applies only to corporations organized for one or more of the purposes indicated in its sub-title, that they are entirely distinct from the railroad corporations organized under title III, and therefore, that the restrictions and provisions of title VI have no application to railroad corporations organized and operating under title III.

Section 2921 of the Political Code provides that boards of supervisors "may grant to any railroad corporation authority to construct a wharf or pier on or in front of any lands owned by it" bordering on navigable water, with a license to take tolls for the use of the same. It is clear from this language that the purpose of the section was to give authority to the board of supervisors to grant franchises for public wharves to be used by the public generally in consideration of tolls to be exacted therefor. This is not only indicated by the language but it is further emphasized by the subsequent provision that the board may do so when it finds the use of such wharf or pier necessary to the exercise of the franchise of the railroad corporation for terminal purposes. There is nothing in the language of the section which purports to prohibit a railroad company from constructing and operating wharves for its own business, without authority from the board, at places where the railroad extends to navigable water and where it finds such wharves necessary for the successful operation of its road. It is clear we think that the section was intended to give the board of supervisors discretion to grant an additional franchise to such railroad, enabling it to carry on a public wharf and charge tolls thereon, where the board finds that such public wharf is necessary to the railroad franchise, and that it was not intended to forbid the railroad from maintaining a wharf for its own purposes without the additional authority to be granted under this section by the board of supervisors.

The additional claim is made that the use of the land along the river front by the plaintiff for wharves, as an adjunct to

its railroad, is forbidden by the clause of section 2 of article XV of the constitution declaring that no corporation claiming or possessing the frontage of navigable water ''shall be permitted to exclude the right of way to such water whenever it is required for any public purpose.'' The land taken for wharves did not belong to the state, but to the defendants. The wharves were to be used for a public purpose, else the suit to condemn it would not lie.   Such wharves would not exclude the right of way for a public purpose, because their use as such would constitute one of the public purposes which the constitutional provision was designed to protect.   If a more necessary public purpose should arise for the land, it could be taken from the plaintiff therefor.   (Code Civ. Proc., sec. 1241.)   This sufficiently answers the argument.

7. In immediate connection with this question of wharves it is proper to consider an exception to one of the instructions. The articles of incorporation of the plaintiff confer upon it, among other things, power to own and operate steamers if necessary, proper or convenient for the convenient use, accommodation, maintenance, and operation of its railroad.   Its right to exercise this power could not be questioned here. (Civ. Code, sec. 358.)   The court instructed the jury that a railroad company had a right to own and hold steamers and run them in connection with its railroad and condemn land necessary for the accommodation of steamers owned by itself or other persons for the delivery of freight and passengers to and from the railroad.

As an abstract proposition there may be some doubt of the power of a corporation organized solely for railroad purposes to own and run steamers.   The instruction for this reason may have been too broad (*Vandall* v. *South S. F. Co.,* 40 Cal. 88), but in view of the express power given by the articles, as above mentioned, it could not have been prejudicial in the present case, for the articles gave plaintiff that power.   It was proper to take into consideration the probable needs of the plaintiff to have wharves for the passage of freight and passengers to and from its cars and steamers upon the river, in determining the area necessary for such wharves.

8. Other instructions directed the jury that they could allow such quantity of land for wharves as they should believe reasonably necessary to accommodate the future business of the road in delivering and receiving freight to and from its

cars to such steamers as they believed would probably be plying upon the river. These instructions were also objected to, and a like objection was made to all evidence as to the probability of business from that source. We think the instructions were properly given and the evidence properly admitted. The objection is based upon the proposition that there is no allegation in the complaint that the land, or any part of it, was needed for the use of steamers or steamer lines. Such specific allegation was not necessary. There was a general allegation that the land to be taken was all necessary for the proposed railroad and there were specific allegations that certain parts of the tract were necessary for certain specified uses pertaining, respectively, to the construction or operation of the road, including freight-wharves and sheds. This, of course, referred to the needs of the plaintiff's railroad, and not to the needs of any connecting railroad or of any steamers delivering or receiving freight to or from its cars. It was appropriate for the plaintiff to procure and maintain all facilities necessary for the accommodation of its customers, whether those customers were freight producers or public carriers. In support of its averments the plaintiff might show that steamers were, or probably would be, plying upon the river, that they would wish to receive freight from plaintiff's cars, or deliver freight to them, and that it would be reasonably necessary for the conduct of said railroad business that the plaintiff should have sufficient wharves whereon to place such goods temporarily in the course of such delivery, and by means of which to pass them to and from the cars and steamers, respectively. We find no error in these rulings.

9. On the question of the necessity of the taking, evidence was also admissible of the nature of the country through which the road would pass and of the territory which would probably contribute freight and passengers to the road for carriage, of the amount and character of the products which such territory would probably yield at the present time and in its probable future growth and development, and of the volume of passenger traffic probable from such territory, and, generally, of all other facts that would tend to show the amount of traffic to be handled by the plaintiff's railroad within a reasonable time in the future. The plaintiff has undertaken to serve the general public as a carrier of freight and passengers over its lines. It is entitled to take the neces-

sary land to enable it to perform its full duty in that regard, both at the present time and in the future, so far as the present and future demands upon its facilities can be determined with reasonable probability. It was largely a matter within the discretion of the trial court how far the plaintiff should be allowed to go into minute details on this subject. We perceive no abuse of discretion in its action.

These propositions cover many objections to the admission of evidence. They include the evidence of the probable production of factories and quarries, arrangements with connecting roads for freight and passenger traffic, the feasibility of reclaiming swamp and overflowed lands and thereby increasing their production, the probability of such reclamation, with the means whereby it could be accomplished and the measures taken by others for that purpose, the needs from probable traffic to and from the city of Sacramento over plaintiff's wharves and its cars, the area required for yardage, and comparisons with the yards of other similar railroad systems in actual operation, accompanied with proper explanations of the differences between the two systems, and also of the uses to be made of the spaces or passageways aforesaid between the wharves. There may be other details to which objection was made which come within the same rule which have escaped our notice because of the large number of such objections. We need not enumerate them.

10. On defendants' cross-examination of Mr. Gregory, president of the plaintiff, he had testified, in effect, that the Sacramento and Woodland Railroad Company had projected a line of railroad from Woodland to Sacramento, connecting with plaintiff's road near the bridge of the plaintiff on the land in controversy, and that plaintiff proposed to receive the cars of said company at this said connection and run them from thence to the city of Sacramento and other places over plaintiff's line. Defendants endeavored to have him testify that a part of the land to be taken was to be used by said company as its own property and for the construction and operation of its own road instead of the plaintiff's road, but he insisted that this was not true. In view of this cross-examination, it was proper to permit him on re-direct examination to explain that the Woodland Company was then constructing its line and to show that the plaintiff's road would

obtain business from the Sacramento and Woodland Railroad when it was completed.

11. Mr. Dozier, a witness for plaintiff, testified at great length, the record thereof covering 254 typewritten pages. His testimony showed that he was a civil engineer by education and occupation; that he had had some ten years' experience in the laying out, construction, and operation of interurban railroads in California, that he was familiar with the effect of such roads in building up and developing a new region and increasing the traffic therein and in drawing freight and passenger business from established lines of steam railroads; also that he had traveled over a great part of the counties through which plaintiff's road ran and had made investigations as to the products and capabilities of production of said territory and the probability of shipments therefrom. A report of the State Agricultural Society purporting to show the amount, in tons, pounds, or measures, of the products of those counties was introduced in connection with his testimony. He was then asked to state his opinion as to the proportion of these products that would probably be shipped over the plaintiff's road when constructed. The court, over the objection of defendants, allowed him to answer. We think his opinion was admissible. The effect of electric roads in the settlement and development of the country they penetrate and in obtaining traffic previously going to other railroads is not a matter of common knowledge. The subject is comparatively new and the mass of the people have had no occasion to inquire concerning it or become familiar with it. The operation of railroads is a business of itself and its effects are not well known except by those who have actual experience and have studied the subject in connection therewith. Especially is this true with respect to interurban railroads which are the result of recent inventions. It may well be termed a "trade" within the meaning of subdivision 9 of section 1870 of the Code of Civil Procedure, allowing opinion evidence.

"Witnesses who are skilled in any science, art, trade or occupation, may not only testify to facts, but are sometimes permitted to give their opinions as experts. This is permitted because such witnesses are supposed, from their experience and study, to have peculiar knowledge of the subject of inquiry which jurors generally have not. . . . To warrant its introduction, the subject of inquiry must be one relating to

some trade, profession, science or art in which the persons instructed therein, by study or experience, may be supposed to have more skill and knowledge than jurors of average intelligence may be presumed generally to have." (*Ferguson* v. *Hubbell*, 97 N. Y. 513, [49 Am. Rep. 544]; *Young* v. *Johnson*, 123 N. Y. 233, [25 N. E. 363]; *Excelsior etc. Co.* v. *Sweet*, 57 N. J. L. 231, [30 Atl. 553].) "When this experience is of such a nature that it may be presumed to be within the common experience of all men of common education, moving in the ordinary walks of life, there is no room for the evidence of opinion; it is for the jury to draw the inference. . . . It is not because a man has a reputation for superior sagacity and judgment, and power of reasoning, that his opinion is admissible. . . . It is because a man's professional pursuit, his peculiar skill and knowledge in some department of science, not common to men in general, enable him to draw an inference, where men of common experience, after all the facts proved, would be left in doubt." (*New England Glass Co.* v. *Lovell*, 61 Mass. 321. See, also, *Ellis* v. *Tone*, 58 Cal. 302; *Judson* v. *Giant Powder Co.*, 107 Cal. 561, [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020]; *Greenleaf* v. *Stockton etc. Works*, 78 Cal. 610, [21 Pac. 369]; *Howland* v. *Oakland etc. Co.*, 110 Cal. 521, [42 Pac. 983]; *Barnum* v. *Bridges*, 81 Cal. 607, [22 Pac. 924]; *Chico Bridge Co.* v. *Sacramento etc. Co.*, 123 Cal. 184, [55 Pac. 780].) The jurors in the present case could have little or no knowledge on this subject. The amount of such business had a direct bearing on the question of the necessity of taking the whole of the land, a proposition which the defendants stubbornly contested, and without aid from those conversant with such matters the court and jury would have been left almost entirely to conjecture. The testimony was properly admitted.

The state agricultural society is a state institution and among its duties prescribed by law is that of collecting information and statistics relating to the agricultural resources and material interests of the state and making a report of the same to the governor. (Stats. 1880, p. 49; Pol. Code, secs. 332, 705, 2326; Stats. 1863, p. 49; Stats. 1871–72, p. 442.) When so ordered by the state board of examiners, this report must be printed as a public document. (Pol. Code, sec. 334.) Such report is an official document and is admissible in evidence as such. (Code Civ. Proc., sec. 1918, subd. 6; *People*

v. *Hagar*, 52 Cal. 186.)  It constituted legal evidence of the facts therein stated regarding the products of the state and its subdivisions, although, of course, not conclusive thereon. (3 Wigmore on Evidence, sec. 1671, subd. 7; *People* v. *Williams*, 64 Cal. 91, [27 Pac. 939]; *People* v. *Wang*, 92 Cal. 280, [28 Pac. 270].)  It is not necessary to say whether or not judicial notice would be taken of it, for the portions of the report relied on were formally introduced in evidence.

12. Many expressions have come under our observation in reading over the evidence showing circumstances indicating that the railroad of plaintiff, when completed, was to be operated by electricity.  The fact could be shown by circumstantial evidence as well as direct.  The objections based on the assertion that there was no evidence of such fact are therefore without foundation and need not be further considered.

13. A map prepared by the witness Tibbetts purporting to show the land below the flood line in the Sacramento Valley was admitted in evidence over the defendants' objection that it was not proven to be correct, or to have been compiled from legal or official sources.  Parts of this map had been colored yellow, parts green, and parts red, by the witness.  He testified that he was a civil engineer, that he had been many times up and down the Sacramento River, had seen most of the lands contiguous thereto, was familiar with all the reclaimed lands delineated upon the map and with most of those in process of reclamation and susceptible of reclamation as marked thereon, that in a general way he was familiar with the country lying along the Sacramento River and had been over it many times, that the map on which the colors were displayed was a printed map issued by a firm in San Francisco and that, aside from the coloring, it was an accurate map of the lands lying along the river so far as he knew; that he had been the engineer for a number of railroad and other corporations, having headquarters in Sacramento for some years, that studies had been in process for a year or more in his office to determine the amount of land reclaimed, being reclaimed and capable of reclamation, respectively, that the data he had put on the map was based partly on personal observation, partly on data gathered by surveying parties under his immediate direction and partly on a compilation from various reliable sources, and that he had been over most of the land personally.

He then testified that the part in yellow correctly showed the reclaimed land, that not all of it was compiled from his personal observation, but that the part not so prepared was made from the most accurate sources of information he could get and that he could point out the parts that had come under his personal observation; that all of many reclamation districts and some portions of every district had been seen by him; that he had been over every one of the tracts in green representing the land then being reclaimed and that they correctly showed such land, that the red parts showed the unreclaimed land subject to overflow, that he had delineated the outline of lands subject to overflow in large part from original surveys, in large part from observation, and the balance from data from the principal reports bearing upon the reclamation in the Sacramento Valley.   He then stated that from his own observation and surveys he could state that all land marked as susceptible of reclamation but not reclaimed, except one hundred and twenty-five thousand acres, was susceptible of reclamation.

He was not asked to point out the parts of the reclaimed land that had come under his personal observation.   But on cross-examination, it appeared that he had used official governmental reports in compiling the map, and that he was very familiar with the condition of the country shown on the map. Taking his evidence as a whole, we are of the opinion that a sufficient foundation was laid to qualify the witness to state approximately the respective areas of reclaimed and unreclaimed land and for the introduction of the map for the information of the court and jury.   The evidence had some bearing upon the question of the future business of the road and the necessity for the proposed taking.   It was not a subject upon which accurate and precise information or evidence could easily be produced and for the purpose of the case an approximate estimate of the respective areas of the different kinds of land was all that the law would require to be shown. It was within the discretion of the court to allow the evidence, although its bearing on the question at issue was somewhat remote.

14. The witnesses Jubb and Hecke were properly permitted to testify to the approximate quantity of freight handled at Sacramento.   They based their estimates on investigations they had made by inquiries of shippers and others engaged

in the freighting business, on the testimony of other witnesses in the case and on the reports of United States engineers appointed to investigate the subject and ascertain the advisibility of reclamation works by the federal government. As we will presently show, the question of the qualifications of a witness to testify to his opinion on such subjects is a matter largely within the discretion of the court. The facts shown could not be proven in detail by calling on the producers and shippers engaged in the trade at Sacramento, without prolonging the trial to an unreasonable length. In any event, an approximate estimate was all that could or need have been procured. We think therefore that the opinion of these witnesses, after the investigation they had made, was proper evidence of the facts which the court and jury would be called upon to review in determining the question of necessity. Its bearing on the question was remote but as it had some tendency to show the necessity it was admissible for that purpose, though of small consequence.

15. The court did not err in admitting in evidence the report of J. G. White & Company made to the plaintiff company. The objection appears to be based on the fact that it contained statements of the probable tonnage of freight coming from the counties through which the plaintiff road will run. It appears, however, that it was not offered to show those facts but for a limited purpose. Wallace, the engineer who laid out the plan of tracks and other structures to be placed by plaintiff on the land in controversy for the operation of its road and upon which the plaintiff based its claim to condemn the land, testified to the various uses to which the several tracts comprised in the land were to be put. On cross-examination by defendants, he stated that this report was furnished him by plaintiff to use in fixing the quantity of land necessary for a terminal for the railroad at that place and in laying it out, and that he used the same in estimating the structures and quantity of land that would probably be required and made his plan accordingly. The general purpose of the cross-examination appeared to be to show that he had made the plans larger than necessary, so as to occupy more ground than the road would use. On re-direct examination the report was admitted in evidence in explanation of the witness' previous testimony. It was competent for that purpose, though unimportant in its bearing on the case. It

would be incompetent as evidence of the tonnage of freight, but we do not understand that it was offered as evidence of those facts. On the contrary, it was explicitly stated that it was offered only to explain why it was that Wallace had fixed upon the land sought to be condemned as the area of land necessary for the plaintiff's use.

16. A number of persons called as witnesses for plaintiff were allowed to give opinions as to the value of the property, after an examination to disclose their qualifications to give such opinion. To this ruling defendants excepted. One Johnson was called as a witness for the defendants on the same subject. He was examined concerning his qualifications and the court thereupon refused to allow him to give his opinion. To this ruling also defendants excepted. It is claimed that his testimony as to his qualifications was not materially different from those of the aforesaid witnesses for the plaintiff and that one or the other of the rulings must necessarily be erroneous.

The question whether or not a witness is qualified to give his opinion, as evidence upon a matter-in issue, is submitted to the trial judge in the first instance, and is to be determined by him before such opinion may be given. (*Fairbank* v. *Hughson*, 58 Cal. 314.) It is, in itself, in the nature of a trial of a question of fact, by evidence addressed to the judge alone, and, as in other decisions on questions of fact by a trial court, his ruling thereon is a matter of discretion and will not be overturned on appeal unless there was an actual want of evidence to support it or a clear abuse of discretion in ruling upon the evidence given on the subject. (*Howland* v. *Oakland etc. Co.*, 110 Cal. 521, [42 Pac. 983]; *Mabry* v. *Randolph*, 7 Cal. App. 427, [94 Pac. 403].) If there is any substantial evidence to sustain the ruling, the exception thereto will be disallowed. (*Conness* v. *Commonwealth*, 184 Mass. 544, [69 N. E. 341]; *Klous* v. *Commonwealth*, 188 Mass. 152, [74 N. E. 330]; *Omaha etc. Co. v. Douglass Co.*, 62 Neb. 7, [86 N. W. 936]; 1 Wigmore on Evidence, sec. 560; 1 Gr. on Evidence, 16th ed., sec. 430f; 2 Elliott on Evidence, secs. 1036, 1037; 17 Cyc. 31.) The witness, Johnson, had less knowledge of values than the witnesses testifying for the plaintiff. He had no actual knowledge of any sales of land on the Yolo side of the Sacramento River. Until two years before the trial he had lived on a ranch five miles north of Sacramento.

He had never been on the land except during a flood a few months before the trial. At most he had only such general knowledge of the subject as any ordinary citizen of Sacramento might have. It may be admitted that if the court had decided the other way the decision would in like manner be sustained, but we must sustain the decision unless an abuse of discretion appears and we cannot say that it is here shown. It does not appear that qualified witnesses on the subject were at all difficult to obtain. Before this witness was called the defendants had already called seven witnesses who had testified on the subject of value. Hence, even if the ruling had been clearly erroneous, we cannot say that it was sufficiently prejudicial to warrant a reversal.

The foregoing comprise a small proportion of the exceptions taken to the rulings during the trial, and mentioned in appellant's briefs. Those not here noticed are either covered by what has been said or they are so trivial as to require no mention.

17. Objection is made to an instruction stating that, as the power of eminent domain is necessary for the public good, "it would be unjust to the public that the plaintiff should be required to pay the owner more than a fair indemnity for the loss he sustains by the appropriation of his property for the general good. On the other hand, the owner being compelled to part with his property, whether he desires to sell or not, the law allows him just compensation therefor." The criticism of this instruction is that it is argumentative. The proposition stated in the instruction is correct and we see no objection to the jury being so informed. It was not improper to instruct the jury that they should allow the owner of the land just compensation and that the public interest demanded that he should receive no more. This was the substance of the instruction.

The next objection is to an instruction regarding opinion evidence. It directed the jury to weigh the testimony of witnesses giving opinions as to value "by reference to the whole situation of the property and its surroundings, and all the surrounding circumstances, and by applying to it your own experience and knowledge. While you cannot act in any case upon particular facts material to its disposition resting in your private knowledge, but should be governed by the evidence adduced, you may and should judge of the weight

and force of the evidence upon your own general knowledge of the subject of the inquiry." It is argued that this would lead the jury to fix the value of the land by their own knowledge of the subject irrespective of the evidence in the case. The jury were many times instructed that they must determine the facts in the case in accordance with and upon the evidence. The instruction quoted forbids them from acting on particular facts resting in their own knowledge. It is evident from the other instructions referred to that this instruction as a whole could reasonably be understood to mean nothing more than that it was that knowledge and experience which the jurors had in common with men in general that they were to apply in weighing the evidence. This proposition is conceded to be correct.

There was no error in instructing the jury that in determining the questions of necessity they should take into consideration the character of the business proposed to be done by plaintiff's railroad and the manner of doing it and the future needs of the communities which the plaintiff would serve and that in so doing they could consider the number of persons to be served by the plaintiff and its road. All these things had a direct bearing upon the probable area required by the plaintiff for its terminal at Sacramento.

The appellants complain of certain instructions which, it is contended, directed the jury that, in determining the question of necessity, they should consider that plaintiff was entitled to take a strip one hundred and sixty-five feet wide across the land solely for the purpose of placing its main tracks and necessary side tracks thereon, although they should find that the entire width was not required for such tracks and that for other purposes, the adjuncts and appendages, they could allow the additional land necessary, without requiring plaintiff to use any of the said strip for such other purposes, although they might believe that it could do so without injury to its business. The most that can be said in favor of this objection is that the instructions, considered together, are not entirely clear. One of them expressly declares that the plaintiff is entitled to a one hundred and sixty-five foot strip, "if necessary for its right of way." We do not think the instructions need be construed as the appellant claims and as the court itself, after several weeks of consideration, found that the strip was required for the main line and necessary

side tracks, the error, even if the instruction had been clear to the effect asserted, would not justify a reversal of the judgment.   The latter proposition applies to other instructions, which we do not expressly mention, on the subject of necessity for the taking.   But we are not to be understood to say that they are in fact erroneous.   Some of them may be ambiguous, but we do not think they were misleading to the jury.

18. The action was commenced and the summons issued on May 5, 1910.   In this connection the court instructed the jury that in determining the compensation to be given the defendant, they must consider the value of the land as it was at the date of the commencement of the action.   This was in exact accordance with the provisions of section 1249 of the Code of Civil Procedure as the section stood at the time the action was begun.   It then provided that, for the purpose of asserting the compensation, the right should be deemed to accrue at the date of the summons and that the actual value of the property at that date should be taken as the measure of compensation.   Afterwards, by an amendment taking effect June 9, 1911, [Stats. 1911, p. 842], the following clause was added to the section: "provided, that in any case in which the issue is not tried within one year after the date of commencement of the action, unless the delay is caused by the defendant, the compensation and damages shall be deemed to have accrued at the date of the trial.   Nothing in this section contained shall be construed or held to affect pending litigation." If the last sentence of this proviso is to be given effect, the amendment does not apply to the case at bar, inasmuch as it was pending at the time the amendment was enacted.   The argument on this point is that the provision is unconstitutional because if allowed to be effective it would constitute class legislation; that persons whose property was taken by actions begun before the amendment would have the compensation fixed by the value at the time the action was begun, whereas those whose property was taken by actions begun after the amendment, would come under the proviso, if the case was not tried within one year after its commencement.   We think this argument is without merit.   The fact that cases were pending at the time the amendment was enacted, concerning which rights may have accrued or negotiations may have been in progress, sufficiently distinguishes such cases as a separate

class, entitled to different provisions from those prevailing in actions to be begun thereafter. (*Gridley* v. *Fellows,* 166 Cal. 765, 769, [138 Pac. 355].) Furthermore, there is nothing in the record to show whether or not the delay in the trial was caused by the defendant. Since it was incumbent upon the appellant to show error by the record, the presumption must be that the delay was caused by the defendant, and that the action of the court below was proper under the circumstances then appearing, if we concede that the provision is to be taken as valid. If it is invalid then the entire proviso on that subject must be eliminated and the section would stand as it was before the amendment. In either case, the instruction would be correct.

19. For the right of way for main tracks and the necessary side tracks and other tracks for chutes, yards, and storage purposes, the judgment gives the plaintiff only an easement in the land. For that part of the land to be used for a storehouse, a blacksmith shop, a machine shop, wharves, offices, and other purposes requiring the construction of substantial buildings thereon, a fee simple estate was condemned. We perceive no error in this. Section 1239 of the Code of Civil Procedure provides that a fee may be taken when land is condemned for a public use requiring the erection of "permanent buildings" thereon. The structures necessary for the purposes thus designated would be of as permanent a character as buildings for any ordinary use, and we think they are "permanent buildings" within the meaning of that section.

The purported judgment of March 23, 1912, is declared a nullity but appellants do not recover costs on appeal on account thereof. The judgments of April 18, 1912, and of April 29, 1912, are affirmed.

Henshaw, J., Lorigan, J., Melvin, J., Lennon, J., *pro tem.,* and Angellotti, C. J., concurred.

Note.—Justice Sloss being disqualified, Justice Lennon, the presiding justice of the District Court of Appeal for the First Appellate District, participates herein *pro tempore,* pursuant to section 4 of article VI of the constitution.

Rehearing denied.