[Civ. No. 4627. First Appellate District, Division One.—November 20, 1924.]

# E. P. MEINECKE, Respondent, v. LEROY D. FRASIER, etc., Appellant.

[1] JURY TRIALS—EQUITY—DISCRETION.—The granting or refusing of a demand for a jury trial in suits in equity is entirely within the discretion of the court.

[2] FRAUD—CONTRACT OF SALE OF AUTOMOBILE—RESCISSION—FAILURE TO SUBMIT SPECIAL ISSUES TO JURY—EQUITY—VERDICT.—In an action in equity for the rescission of a contract of sale of an automobile on the ground of false and fraudulent representations inducing the purchase, no harm could result from the failure to submit special issues to the jury, since a verdict in an equitable action is merely advisory, and the court is not bound by the verdict of a jury, even where issues of fraud are involved.

[3] ID.—VERDICT—FINDINGS BY COURT.—In such action, the trial was not concluded with the rendition of the verdict, but required findings by the court to complete the record.

[4] ID.—EQUITY—ISSUES—VERDICT.—The rendition of a general verdict in equity cases is not determinative of the pleaded issues.

[5] ID.—ENTRY OF JUDGMENT BY CLERK—APPEAL—CORRECTION OF ERROR BY COURT—JURISDICTION.—In such action, the action of the clerk in entering judgment in conformity with the verdict in favor of plaintiff on the same day that the verdict was returned, without any order from the court and in the absence of findings, was premature and without authority or effect, and the trial court was not without jurisdiction, even though appeal had been taken, to correct its records by ordering the vacation of the judgment entered by the clerk and by showing that the entry of such judgment was inadvertent and was made prior to the rendition of any judgment by the court, and without any order from the court.

[6] JUDGMENTS—ERRORS OR DEFECTS—CORRECTION OF—JURISDICTION.—Any error or defects in a record, occurring through acts of omission or commission by the clerk in entering of record the judgment or proceedings of the court, may be corrected at any time by the court, on its own motion, or on motion of either party.

---

1. See 10 R. C. L. 529.
3. See 26 R. C. L. 1084, 1088.
5. See 15 R. C. L. 702.
6. Amendment of judgment, notes, 12 Am Dec. 351; 62 Am. St. Rep. 233. See, also, 15 R. C. L. 671; 14 Cal. Jur. 993, 995.

[7] ID.—MISTAKE—CORRECTION OF—JURISDICTION—APPEAL.—The right of the lower court to amend its record to conform to the truth is not suspended or impaired by an appeal where the amendment does not affect any substantial rights of the appellant, and consists of the correction of a clerical mistake appearing upon the face of the record.

[8] FRAUD—FINDINGS—EVIDENCE.—In such action, the findings made in favor of plaintiff are supported by the evidence.

[9] ID.—EXECUTED CONTRACT—ACTUAL FRAUD—RESCISSION.—In such action, the trial court was justified in granting rescission of the executed contract where the case is based upon actual fraud and comes squarely within the provisions of the law applicable thereto.

---

(1) 21 C. J., p. 585, sec. 721.　(2) 21 C. J., p. 594, sec. 735.　(3) 21 C. J., p. 594, sec. 734.　(4) 21 C. J., p. 396, sec. 735. . (5) 3 C. J., p. 1266, sec. 1382.　(6) 3 C. J., p. 1266, sec. 1382.　(7) 3 C. J., p. 1267, sec. 1382.　(8) 35 Cyc., p. 84.　(9) 35 Cyc., p. 157.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.　T. I. Fitzpatrick, Judge.

The facts are stated in the opinion of the court.

Harding & Monroe and Robert H. Borland for Appellant.

Goodfellow, Eells, Moore & Orrick and R. W. Palmer for Respondent.

ST. SURE, J.—Action in equity for the rescission of a contract of sale of an automobile on the ground of false and fraudulent representations inducing the purchase. The action was tried with a jury, which on May 3, 1922, returned a general verdict in favor of plaintiff. On the same day, in conformity with the verdict, the clerk entered judgment, on which notice of appeal was filed May 11, 1922. On May 18, 1922, the trial court made an order purporting to vacate the judgment entered by the clerk; in this order the trial court said that the entry of the clerk appeared to be inadvertent, and "that said judgment was so entered by the clerk prior to the rendition of any judgment in this action by this court, and without any order from this court." On

---

7.　Amendment of judgment after appeal, note, 14 Am. Dec. 516. See, also, 15 R. C. L. 679, 681; 14 Cal. Jur. 1003.

9.　See 4 Cal. Jur. 770.

June 7, 1922, the trial court made its findings of fact and conclusions of law, judgment, and decree. From the latter judgment appeal was taken on June 15, 1922. The appeals have been consolidated.

Plaintiff had demanded a jury at the time of setting the case for trial, and at the time of trial defendant objected to its impanelment on the ground that the action was purely equitable, the only issue being the fraud charges. The court overruled the objections, and the trial proceeded before a jury. [1] The granting or refusing of a demand for a jury trial in suits in equity is entirely within the discretion of the court. (*Curnow* v. *Blue Gravel etc. Co.,* 68 Cal. 262, 264 [9 Pac. 149]. See, also, *La Societe Francaise* v. *Selheimer,* 57 Cal. 623, and *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545 [147 Pac. 238].)

The complaint alleges that the automobile was falsely represented to be in first-class condition in every respect, free from defects, slightly used, but carefully driven during such use, and in all respects as good as a new car; that plaintiff believed and relied upon said representations and was thereby induced to purchase the car; that as a matter of fact the main frame of the automobile had been broken prior to June 21, 1921 (the date of the preliminary contract of purchase), had been patched up in a careless and unworkmanlike manner and was on said date weak and unfit for its purposes, and that due to such defective condition the automobile frame broke and plaintiff was unable to use it. That shortly after the breaking of the frame plaintiff learned for the first time that the automobile had been in a wreck, immediately notified defendant of his rescission of the contract, tendered back the car and demanded the return of the purchase price. The sale price of the automobile was $4,000, $1,500 of which was to be paid in cash, plaintiff's 1916 Apperson automobile delivered at a valuation of $1,000, and the balance to be paid in installments covering a year's time. The installment payments were anticipated and the car was fully paid for on September 6, 1921. Plaintiff prayed that the "contract be declared to be rescinded and at an end and that he recover from said defendant the sum of four thousand dollars," together with interest and costs.

Defendant answered, denying the making of any false or

fraudulent representations or warranties; affirmatively alleging that he informed plaintiff at the time of negotiations before the sale that the car was a used car, had been driven about 6,000 miles, had been in a wreck but the motor and other mechanical parts had been overhauled and he believed them to be in good condition, and that the top had been rebuilt. He denied that the car was not in first-class condition, and alleged it was free from defects; he denied the breaking of the frame prior to June 21, 1921, and any patching up thereof, or that it was weak and unfit for its purpose; and alleged that if it was so broken he was ignorant of it. Notification of rescission was admitted, but the allegation made that plaintiff had refused inspection of the automobile or opportunity to ascertain its condition.

As affirmative defenses it was alleged that plaintiff was a man of large experience in the use of automobiles, acquainted with their construction and operation; and defendant set up the making by plaintiff of a preliminary order contract on June 21, 1921, after an examination of the automobile, "subject to demonstration being satisfactory to purchaser," and containing also the following provision: "There are no understandings, agreements, representations or warranties, expressed or implied, not specified herein, respecting the goods hereby ordered." After a demonstration of the car, defendant alleges that on June 23, 1921, plaintiff made and delivered a formal contract of purchase of said automobile, in which he admits that the automobile is in first-class condition, and also that "it is understood that no warranty accompanies said property except the standard warranty under which said car is manufactured." It is also alleged that after delivery of the contract, in response to plaintiff's desire to have the warranties made more definite, defendant by letter to plaintiff dated June 25, 1921, applied the standard warranty for new cars to the car sold, excepting items mentioned as trade accessories, separately warranted by the respective manufacturers thereof, on which the warranties had expired. Defendant further specifies that on completion of payment for the car on September 7, 1921, the plaintiff still being doubtful as to the sufficiency of identification of the warranties mentioned in the contract, a letter was delivered him by the company in which

it agreed to furnish "service, etc.," on the automobile, "this service and guarantee to be the same as guarantee furnished the Frasier Motor Company by the Apperson Bros. Automobile Co." It is alleged that the break in the frame occurred subsequent to the ninety-day period of the standard warranty applied to the car, and that plaintiff at no time complied with the conditions of the warranty by transmitting or delivering to defendant the alleged defective parts of the automobile for inspection or examination, but refused to permit inspection.

The case went to trial on the issues thus framed.

Defendant concedes that "the only issue in the case is the truth or falsity of the charges of fraud made by the plaintiff." He complains that the trial court "committed prejudicial error in submitting the entire case to a jury," pointing out that no special issues were submitted to the jury and that the jury returned a general verdict. [2] In this instance no harm could result from the failure to submit special issues for the following reasons: The verdict in an equitable action is merely advisory; a court is not bound by the verdict of a jury, even where issues of fraud are involved. (*Moore* v. *Copp,* 119 Cal. 429 [51 Pac. 630]; *Angus* v. *Craven,* 132 Cal. 691, 696 [64 Pac. 1091]; *Davis* v. *Judson,* 159 Cal. 121 [113 Pac. 147]; *Cobe* v. *Crane,* 173 Cal. 116 [159 Pac. 587].) [3] The trial was not concluded with the rendition of the verdict, but required findings by the court to complete the record (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co., supra*). [4] The rendition of a general verdict in equity cases is not determinative of the pleaded issues. (*Leonard* v. *Castle,* 67 Cal. 41 [7 Pac. 34]; *Moore* v. *Copp, supra; Vallejo etc. R. R. Co.* v. *Reed Orchard Co., supra.*)

[5] It therefore follows that the action of the clerk in entering the judgment of May 3d upon the verdict was premature and without authority or effect. (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co., supra; Farrell* v. *City of Ontario,* 39 Cal. App. 351 [178 Pac. 740].) As a corollary of this proposition it is clear that the trial court was not without jurisdiction to correct its records in the premises, even though appeal had been taken. [6] Any error or defects in a record, occurring through acts of omission or commission

by the clerk in entering of record the judgment or proceedings of the court may be corrected at any time by the court, on its own motion, or on motion of either party. [7] The right of the lower court to amend its record to conform to the truth is not suspended or impaired by an appeal where the amendment does not affect any substantial rights of the appellant, and consists of the correction of a clerical mistake appearing upon the face of the record. (*Halpern* v. *Superior Court,* 190 Cal. 384, 387 [212 Pac. 916].) And surely it may not be here maintained that any substantial rights of the defendant were affected by the action of the trial court in correcting its record, because we are now considering consolidated appeals from both judgments, and, as defendant pertinently says in his opening brief, "the only issue in the case is the truth or falsity of the charges of fraud made by the plaintiff."

Passing to a consideration of the case on its merits, the record shows that the findings of the trial court substantially followed the allegations of the complaint, with a particular finding on inducement by silence with regard to the wreck and failure to disclose the name of the former owner of the car. Judgment was for rescission of the contract and the return of $4,000 to plaintiff ordered, on which payment the automobile was to be returned to defendant. [8] It is objected that the findings and judgment of the court are not supported by the evidence.

Defendant testified that he did business in 1921 in San Francisco under the name Frasier Motor Company, and handled the Apperson agency for northern California. The automobile in question was purchased from his predecessor by one Mori some time before October, 1920, and had been in an accident in which it turned over with the purchaser, his wife and baby, killing the child. Defendant took the wrecked car from the insurance company in transactions to give Mori a new car, receiving about $1,200 from the insurance company and $250 from Mori, and the wrecked car, giving Mori a used car which had been held by defendant at $3,850. Defendant's testimony as to the condition of the wrecked car is as follows: " . . . The top had been mashed in and left where it was wrecked. The windshield was off, a couple of fenders were off, and the running-board.

. . . In this wreck he had sprung the front gooseneck. . . . The portion of the chassis or frame which protrudes past the front axle. . . . There were a couple of them (wheels) bent, or, they were disc wheels, and they were dished— two of them were distorted. There were no breaks in the frame that I knew of. I started the negotiations with Dr. Meinecke. I did not complete the deal. I told Dr. Meinecke the history of the car, who the owner was. I described the whole thing, the first time I ever talked to him. He asked me why the price was less than new. The selling price of that car new was $4,650 at San Francisco. It was a 1920 car. . . . I did not state to Dr. Meinecke that this car was in first-class shape and better than a new car. I told him that this car had been rebuilt and that we would guarantee it as a new car, by that I mean the regular warranty. I made no statements to Dr. Meinecke as to the mileage of this car. The speedometer was there. It was somewhere around five or six thousand miles as I remember it.''

S. A. Ponce, a garageman at Half Moon Bay who had been in the automobile and repair business since 1912, testified that he put the car in condition to be taken into San Francisco in the spring of 1921. To defendant's description of the elements of the wrecked condition of the car he added a third wheel dished, the side caved in, the frame was bent in on the right side and cracked on the left side. ''Cracked right at the bottom of the U bar—that is, broke, about one inch ahead of the steering gear—where the steering gear bolts on to the frame. We had to straighten the rear end. I put the car in shape so that it would run into San Francisco. In doing so I welded this crack in the left side of the frame. At the time I towed the car into my garage the crack in the frame was on the inside of the U bar, but you could see it because the frame had sagged. My man delivered the car to the American Insurance Company and I had no communication with Mr. Frasier or Mr. Barthorpe. When I saw the car this morning there was a crack in the frame through the old weld which I had put in the frame. There was also a new crack in the frame about an inch and a half from the first one.''

Being recalled, he was asked if the weld or evidence of the weld in the frame could have been detected at the time

the car was taken to San Francisco from his place, and he replied: "You could see it if you looked at it. I seen it. I welded it. When the car left my place of business there was evidence both on the outside and inside of the frame that the frame had been welded. When you weld it you heat it and burn the paint. It would show up on the frame.". He testified further that from the inside, to a mechanic taking down the motor, the fact of a weld in the frame would have been plainly apparent. A car which had been wrecked to the extent that this one had, particularly the frame, "the vital part," could not be rebuilt so that it would be as good as a new car if the old frame was used. "Instead of putting a new frame in, we welded it and pounded it out. If I had put in a new frame it would have been just as good as a new frame. . . . But we did not have orders to do that. . . . That is why I objected to the motor and the frame as not being in good condition. That is why I would not consider it as good as a new one. . . . It is not humanly possible to straighten the old frame." On cross-examination he testified that when he welded the frame there was but one break, an examination of it the day of the trial showed two, parallel. "It broke right back into the weld again, where it was parted. The break was on the left-hand side and was within two inches where the steering knuckle is assembled."

Plaintiff testified that he was a pathologist for the United States Department of Agriculture, connected with the forestry service, that he made trips to the mountains in summer and less in winter. While engaged in seeing about repairs to his 1916 Apperson car at the Frasier Company in June, 1921, he was urged by the men there to buy a new car. "I had conversation with Mr. Barthorpe and Mr. Conant at which Mr. Frasier was present, at the Frasier Motor Company's office on Van Ness Avenue. I stated that my work took me largely into the mountains over dangerous mountain roads; that I used the car hardly at all in the city . . . very little on the highways and mostly on dangerous mountain roads. This was in May and June, 1921, . . . at perhaps the eighth or tenth visit to their establishment. It was said that this particular car had been slightly used only; . . . that the car was put in perfect condition; that

the car was now really in a better condition than a new car, because it had been tried out by the former owner; that the car was in every respect in such condition that I could trust it explicitly in my more than unusually risky work. I was told that the car had been driven not very many miles and had been driven fairly carefully at that time I did not know at the time I purchased that car that it had participated in any wreck or had ever been mashed up and rebuilt. I did not know of such fact until October 11, 1921, when told of it by Frasier. . . . I have no use for that type of car. . . . My consent to entering into this contract would not have been obtained if the history of the car showing a wreck such as stated to me were disclosed to me. . . . On October 7th (1921), I was driving from Mariposa Big Trees on the Jamestown road to Oakdale. . . . At Oakdale I turned into a gas station and noticed that the steering gear froze. I could not get into the road again. It had to be taken to a repair shop nearby and was put over a pit. . . . My attention was immediately called by the mechanic . . . to a break in the frame. There were two breaks, two old breaks, visible, both of them welded, and one of them was broken clear through the entire frame. I left the car at Oakdale. Upon coming to San Francisco I went to see Mr. Frasier . . . October 11th. I then learned for the first time that the car had been in a wreck. Mr. Frasier said that the car had been wrecked by the former owner and badly smashed up; that a child had been killed; the owner nearly killed; that the car had been repaired and put in shape again and turned in because the former owners did not want to further drive it. This was the first intimation that I had ever had of an accident having happened to the car before I purchased it. Before I purchased the car I asked how far it had been driven as the speedometer was disconnected. I was told that it had been driven 2600 miles and that if I set my speedometer at that figure I would be approximately correct.''

The letter of rescission written November 2, 1921, was introduced in evidence and it was admitted defendant received it. Dr. Meinecke further stated that he had driven automobiles for several years and was a careful driver; that although he knew something about the general relations of

the principle underlying the automobile, he knew nothing practical about the mechanics. He had not used or driven the car since the seventh day of October, 1921, at which time the break in the frame occurred at Oakdale.

Being recalled for further cross-examination, plaintiff testified that after many visits for repairs to his own car, Mr. Frasier suggested that he exchange his old car for the new car. The car was on the floor of the Frasier Motor Company's place. "I asked Mr. Frasier why the price was so high, $4,000—so close to $4,650. The answer was that the car was in such perfect shape that it was practically as good as new, in fact better than new."

H. E. Hobbs, an automobile machinist for seven years, testified that in October, 1921, he went to Oakdale and brought back an Apperson car. He found the car in the garage at Oakdale and "on examination found the frame was broken and sagging down. . . . There was a break there before. . . . It was welded and broken apart at the weld. . . . They had not been sawed. I am not certain, but I think I went up there to get the car on the 7th day of October, 1921. The car had been in the Oakdale garage a couple of weeks when I got there."

On recalling Dr. Meinecke for cross-examination, defendant introduced the preliminary contract set out in the pleadings, and the formal contract of sale, and elicited the statement from plaintiff that he had been out in the car prior to signing the formal contract, and that he liked the motor—"the motor is practically the only thing that a layman driver like myself can judge. I was satisfied with the warranty with regard to the car itself. . . . I was told that the car with its accessories, with one exception—the tires—would be guaranteed as new accessories. That is what I referred to in this letter. I took the car on two trips outside of San Francisco. There may have been some shorter trips. I was on the first trip, I should say, a week or ten days. Another trip was the one on which the accident occurred. That trip was to Mariposa Big Trees and from there to Angels Camp, and from there to Jamestown and to Oakdale. There is where the accident occurred. During the time from June 21st to the time of the accident I had driven 1894 or 1895 miles. After the accident at Oakdale I took the car to a garage and came to San Francisco and communicated

with the Frasier Motor Company. I saw Mr. Frasier on October 11th; told him what had happened. . . . He asked where the car was. I told him finally at the end of the interview that the car was at Oakdale, but I did not tell him where, in what garage.'' He stated that he had his doubts at the time whether it would be wise to tell Frasier, and that the first he knew definitely that defendant had been notified where the car was, with opportunity for examination, was late in December, 1921. Complaint in this action was filed November 5, 1921.

On redirect he again testified that he first learned that the car had been in a wreck on October 11th. ''Immediately after that I wrote to the motor vehicle department at Sacramento to find out the name of the former owner of my car, as Mr. Frasier in the conversation of October 11th did not disclose the name.''

Defendant introduced first a radiator, fender, and welding worker with an experience in that line of ten years, who testified that a recent examination of the automobile showed that the frame had been sawed in two places ''from the looks of it for removing something and was straightened back, and there was a very poor job of welding. If the job had been done properly the frame would never have broken down under any condition, because welding today can be done as good as a new piece. . . . It is stronger at that place than it was before if the job is done properly. A second break would never take place at the same point. The two sawed lines are absolutely straight. . . . I have never known an instance where there was a break in an iron framework of that kind, where the frame was broken in absolutely parallel lines.''

On cross-examination he testified the sawing had been done prior to the welding and the welding was over the sawed part; he could see the toothmarks of the saw. They had tried to weld it. It was not welded. ''The metal was never fused together and it just simply fell apart. . . . It is in a place where it would be very hard to notice unless he was looking for . . . some trouble like that. . . . Where the welding shows is underneath. . . . The saw marks would be below.''

Burton Larkins, of Larkins & Company, automobile body building and top repairing, testified for defendant that he

built a top for an Apperson automobile for the Frasier Company in the spring of 1921 and lined up the body. . . . Most of the members of the body were broken. "The doors were broken and we replaced them and rebuilt the body and repaired the metal panels. It was an absolutely guaranteed job. I would say that it was stronger than a factory body, because we put in better hardwood than was in the original job. After they repaired the chassis he sent it out to us, and we mounted the body. . . . If the chassis was not in perfect line we would have been unable to install the body which we had repaired."

Arthur M. Corona, an automobile mechanic in the employ of Frasier in 1921, testified that all the work on the automobile was done under his supervision. He testified that "we . . . disassembled . . . inspected the motor and everything in the car. Everything was inspected and overhauled." He detailed what was done. On inspection of the car the morning of the trial he found two cuts. "That frame has been sawed. There are two saw marks there, about an inch and a half apart." He stated that by sawing the framework at this particular point and then taking that part of the frame and twisting it at right angles the steering-post can be taken out without disassembling it. He did not notice the cuts or saw marks at the time the work was done on the machine in Frasier's shop. The cuts had something to do with the sagging of the body, or the freezing of the steering-post. "When the cap there wore out to the top the frame just sagged right down. There was just a lot of metal put on the bottom of the frame to cover up the crack. The frame itself was never welded. The metal was never fused. We lined up the frame." Asked if he did not see the crack, he replied, "No, we did not look underneath. . . . On the side it was all right."

On cross-examination this witness' testimony is as follows: "The cuts were old cuts and had been in the frame for some time; I saw no tooth marks. The weld was put on after the cuts were made. We did not clean the dirt out of the frame when we repaired the car before it was sold to Dr. Meinecke."

The mechanic who worked on the car detailed the work done on it in the Frasier shop. He did not see any cuts or breaks in the frame at the time, or evidence of any, or of

any work done on the frame. Inspection the day of the trial showed two distinct cuts about an inch and a half apart. "Underneath the channel there has been something done to the bottom of it. I would not call it a weld." There was no indication of work done on the inside of the frame.

On cross-examination he stated he did not think the cuts were ever closed. "They seem to be just about as wide as a saw blade apart now." He also stated that no welding had been done in the shop of the Frasier Company, there was no equipment there for welding.

John S. Barthorpe was employed as bookkeeper and assistant to Mr. Frasier by the Frasier Motor Company at the time the transactions respecting the car took place. He stated that the car was registered with the motor vehicle department as a demonstrator, "although this was against the law and a mistake on my part." "I took the car to Larkins myself at the time it left the shop. At that time it was in A-1 condition. That was just the chassis."

The defendant Frasier testified that about June 10, 1921, Dr. Meinecke talked to him, saying that he would like to own a new car but could not afford one. "I showed him this particular car, told him the price was $4,000. I turned the case over to a man by the name of Conant. . . . Mr. Conant then proceeded to complete the sale. I told Dr. Meinecke the history of the car and I told Dr. Meinecke that the car had been rebuilt, and we considered it in perfect condition. I told him that the car had been turned over with a man and his wife and child, and that the child had been killed. I gave him the price of the car, I told him the entire history of the car, the man's name as well. The car was known in my place as the Mori car. There was no secret about the car. I do not recall talking to Dr. Meinecke directly relative to this car until after he had an accident and came to my store. Dr. Meinecke came in and told me what had happened to his frame. The first thing I asked of Dr. Meinecke was where the car was. He said that I had nothing to do with that, he wanted to know what I was going to do. . . . In this conversation he did not admit that the car was in the vicinity of Oakdale. This conversation I presume was within a week or ten days after this accident.

Dr. Meinecke never did tell me where the car was. I found that out from my attorney, Mr. Harding. . . . I do not recollect ever telling Dr. Meinecke that this car was better than a new car. . . . Within the last week or ten days . . . I saw on the bottom web there were two marks which had the appearance of being cut, one is very keen on the edge. The other one has the appearance of metal having flowed on it. There are two cuts about an inch apart, or it may be an inch and a half. At the time I made the sale to Dr. Meinecke I had no knowledge of any cuts or breaks in this flange at the channel iron. I had no knowledge of any attempted welding or puttying of those cuts or breaks. The first time I had definite knowledge . . . was about two or three weeks after this suit was instituted against me. . . . At the time that I sold this car to Dr. Meinecke I believed the car to be in first-class condition. I would not have sold that car to Dr. Meinecke, or to anyone else, if I had known that in the channel iron and in the flange at the base of the channel iron there were two cuts approximately an inch and a half apart, at right angles to the channel iron, and running clear back to the angle. . . . If I had known that the frame was in that condition I certainly would have replaced it. . . . I offered to give him a new frame. I offered to give him a new automobile. . . . I did not tell Dr. Meinecke on October 11th that his ninety days had expired, and that I could do nothing for him. After Dr. Meinecke refused to tell me where the car was, I said 'we will get the car in here, and if there is anything to be done that is up to me I am perfectly willing to do it.' "

In rebuttal Dr. Meinecke stated that Frasier did not offer to give him an automobile that had never been used, but had offered him a 1917 car which had run a long distance and was old in appearance, and the other a seven-passenger touring car for which he would have no use in his work.

[9] We think that the evidence is sufficient to sustain the findings.

Defendant complains that the judgment is not supported by the findings because the court failed to find upon the special defense in the answer concerning the contract of sale and certain written warranties. It is the contention of defendant that in the determination of the case the trial court

was bound by the written warranties. It is argued that in cases where the contract has been fully performed, rescission will be decreed only in extreme cases, "that nothing short of *actual fraud* or mistake will justify the court in granting the rescission of an executed contract." (24 Am. & Eng. Ency. of Law, 2d ed., p. 612, and cases cited.) From the pleadings, proof, and findings it seems to us that this case is based upon actual fraud and comes squarely within provisions of the law applicable thereto. (See secs. 1689, 3406, 1572, Civ. Code.) We deem it unnecessary to discuss other assignments made by defendant. Nothing approaching reversible error is presented, and the judgment is therefore affirmed.

Knight, J., and Cabaniss, P. J., *pro tem.,* concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 19, 1925.

All the Justices concurred.